[Civ. No. 24903. Fourth Dist., Div. One. Sept. 30, 1983.]

ROBERT PAT KELLY et al., Plaintiffs and Respondents, v.
TRI-CITIES BROADCASTING, INC., et al., Defendants and Appellants.

---

**COUNSEL**

Linda M. Woolcott and Higgs, Fletcher & Mack for Defendants and Appellants.

David R. Thompson and Thompson & Thompson for Plaintiffs and Respondents.

Opinion

**STANIFORTH, Acting P. J.**—This court is called upon to review an order to arbitrate and an order confirming the arbitrator's award.

In 1975, Tri-Cities Broadcasting, Inc. (Tri-Cities) purchased a radio business from Far West Broadcasting Corp. (Far West). The radio business operated on land leased from the father of Robert Pat Kelly and Richard C. Kelly (the Kellys). Tri-Cities purchased the lease as a part of the purchase of the business.

This appeal is taken from the trial court's order correcting and confirming an arbitration award and judgment thereon. However, both sides agree to this court's review of the initial order to arbitrate. (*Spence* v. *Omnibus Industries* (1975) 44 Cal.App.3d 970, 976 [119 Cal.Rptr. 171]; *Maddy* v. *Castle* (1976) 58 Cal.App.3d 716, 719-720 [130 Cal.Rptr. 160], disapproved on another point in *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180 [151 Cal.Rptr. 837, 588 P.2d 1261].)

In the order to arbitrate controversy the trial court found Tri-Cities and Jeffrey Chandler, president of Tri-Cities, "assumed the lessees' obligations under the terms of that certain 'Lease Agreement' executed in 1965 . . . ."

The relevant facts begin with the entry into a lease to run for 20 years from February 1, 1965, between S. L. Kelly, the deceased father of the Kellys, and Gordon and Irene B. Bambrick (the Bambricks), doing business as Carlsbad Broadcasters. The lease was for a parcel of real property in Carlsbad on which the Bambricks placed a radio tower, antenna and transmitter. The lease provides: "In consideration of the lease hereby granted to Lessee by Lessor, Lessee hereby agrees to provide Lessor with five minutes of radio program time per day, seven days a week, which program time shall be utilized to advertise business enterprises and activities of S. L. Kelly and/or assigns."

In 1970, the Bambricks sold the station to Far West. Far West was aware of the rent provision of the lease and provided radio time when it was requested in accordance with the lease.

In 1975, after several years of nonuse, the radio station was sold by Far West to Tri-Cities. Tri-Cities became the owner of all the assets of the radio station. For a period of at least nine months, Tri-Cities operated a radio station at the site covered by the original lease. The sale was consummated in July 1975; the leased premises, a transmitter site, was abandoned in late June 1977.

The addendum to the purchase agreement between Far West, Jeffrey Chandler and Tri-Cities provides: "6. *Land lease assignment.* Seller acknowledged the [existence] of a land lease covering the real property on which the broadcasting transmitter is located. Such lease should be included as an asset of the corporation on Exhibit 'A,' being effectively transferred to Buyer. However, the assignability of such lease will be subject to its terms." Exhibit A, item 10, to the purchase agreement lists: "Land Lease covering real property on which broadcasting transmitter is located. (Assignability of such Lease will be subject to its terms.)" The bill of sale involving the Far West, Tri-Cities transaction lists as number 10: "Land Lease covering real property on which broadcasting transmitter is located."

Paragraph VII of the original lease agreement states: "Lessor hereby agrees that in the event Lessee shall form a corporation for the purpose of operating Radio Station KCLB, that this lease may be assigned to said corporation; or if Radio Station KCLB shall be sold to any party other than Lessor, under the terms of this Lease Agreement, that this lease may be assigned by Lessee to said buyer without further obligation on the part of Lessee. However, Lessee hereby warrants and represents that in the event said assignment shall ever take place, the assignee therein shall assume all of the liabilities and obligations assumed by Lessee in this Lease Agreement."

The original lease further provides in paragraph IX: "The assigns and/or heirs of both parties shall carry out the terms of this Lease Agreement." Neither Chandler nor any other representative of Tri-Cities read or reviewed the lease before completing the purchase of Far West's assets. Tri-Cities did not expressly agree to pay rent for the balance of the lease term.[1]

At the time the petition to order arbitration was considered, the trial court file contained a verified complaint on behalf of the Kellys, a declaration under penalty of perjury of Jeffrey Chandler, various pleadings and points and authorities on both sides.

The declaration of Jeffrey Chandler states he is the president and chief operating officer of Tri-Cities, as such he had entered into negotiations with Far West to purchase all the assets of Far West, and: (1) he was not sure a written lease existed, (2) no written assignment of the lease was executed to Far West at the time of its 1970 purchase or thereafter, (3) Far West was aware of the rent and had provided radio time to the lessor on demand in

[1]The record shows in 1977, a conversation about the lease occurred between Robert Kelly and Jeffrey Chandler. In 1979, the Kellys demanded Tri-Cities provide time on their station to be used by the Kellys as rent under the lease. Tri-Cities refused.

the first years of its ownership, (4) during the last years of Far West's ownership, and until 1979 no demand for radio time had been made, (5) Tri-Cities did not assume the lease because it intended to move the transmitter to other property, (6) Tri-Cities' interest in the lease was limited to the period of time it was waiting for FCC approval of its new site and station, and (7) when approval was received, Tri-Cities moved the transmitter and abandoned the site.

The Kellys' verified petition to compel arbitration alleges: (1) Tri-Cities paid property taxes on the radio tower, (2) Tri-Cities named the Kellys as additional insureds on Tri-Cities' policy of liability insurance covering the leased property, (3) Jeffrey Chandler stated to Robert Kelly in a conversation in 1977, "I guess I will have to honor the lease provision," and (4) the Far West, Tri-Cities purchase agreement, the lease and the possession of the property by Tri-Cities are proof of Tri-Cities' assumption of the lease.

The lease agreement expressly provides for arbitration of any dispute which "the parties hereto or their assignees shall be unable to resolve . . . ." Such arbitration is to be before the American Arbitration Association and the decision is to be "final and binding."

The arbitrator expressly found "That I am bound to follow the Superior Court finding that the lease was assumed by the Respondent JEFF CHANDLER and that the Superior Court finding of assumption is conclusive."

DISCUSSION

I

■ A party who has been compelled to submit to court-ordered arbitration is entitled to have the validity of that order reviewed on his appeal from a "judgment confirming an award." (*Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 353 [133 Cal.Rptr. 775, 84 A.L.R.3d 343].) If the trial court has found an agreement to arbitrate when one does not exist, the finding is an abuse of discretion because an essential jurisdictional fact is missing. (*Id.*, at p. 355.)

Tri-Cities moved to vacate and dismiss confirmation of the award on the basis that it was not bound by the arbitration agreement; the trial court refused, saying Tri-Cities could have appealed the earlier order to arbitrate. Tri-Cities was not required to appeal the superior court order to compel arbitration.

*Titan Enterprises, Inc.* v. *Armo Construction, Inc.* (1973) 32 Cal.App.3d 828, 832 [108 Cal.Rptr. 456] (disapproved on another point in *Doers* v. *Golden Gate Bridge etc. Dist., supra,* 23 Cal.3d 180), held the party who objected to a superior court order to compel arbitration may raise his objection either by opposition to the petition to confirm or by a petition under subdivision (d) of Code of Civil Procedure section 1286.2, the procedure to vacate the award. In *Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 610 [204 P.2d 23], the California Supreme Court held the validity of a contract to arbitrate may be questioned in a proceeding for order confirming the award. The court stated: "[T]he power of the arbitrator to determine the rights of the parties is dependent upon the existence of a valid contract under which such rights may arise. [Citations.] In the absence of a valid contract no such right can arise and no power can be conferred upon the arbitrator to determine such nonexistent rights. The question of the validity of the basic contract being essentially a judicial question, it remains such whether it is presented in a proceeding 'for an order directing . . . arbitration' under section 1282 of the Code of Civil Procedure or in a proceeding 'for an order confirming' or 'vacating the award' under sections 1287 and 1288 [now §§ 1285 and 1286] of said code." (*Ibid.*)

Tri-Cities presented evidence the contract was inapplicable in both the proceedings for the order directing arbitration and the hearing for an order confirming the award. The issue is properly before this court.

## II

Turning now to the merits of the appeal, we heed this first rule: The facts must be viewed in the light most favorable to the judgment. Even so, no conclusion can be drawn but that Tri-Cities did not expressly assume the terms of the lease. In every case examined where there has been an express assumption, the assignee has stated specifically either orally or in writing that he agrees to be bound by the terms of the lease including the covenant to pay rent. As demonstrated *infra* III, this is a law-imposed requirement.

In *Lutton* v. *Rau* (1918) 37 Cal.App. 429 [173 P. 1111], the court said Rau did not enter a contract either with his assignors or the lessor which bound him to fulfill the covenants of the lease "other than such obligations as would by implication be imposed upon him because of his entry and assuming possession of the leased premises." (*Id.,* at p. 430.)

In *Bank of America etc. Assn.* v. *Moore* (1937) 18 Cal.App.2d 522, 525 [64 P.2d 460], the appellate court found Moore bound to perform the lease provisions because there was privity of contract. The court said: "In our

case . . . we have not a naked assignment creating privity of estate only, ceasing with cessation of possession, but one clothed with the express assumption by the assignee of the obligations of the lessee." (*Ibid.*) The assignment bearing the signature of both the assignee and the assignor concluded with this paragraph: "'It being understood that the said Assignee, John V. Moore, is to accept, assume and agree to perform all of the terms, conditions and limitations contained in said lease. . . .'" No such language or any equivalent was presented to the trial court here.

In *Timm v. Brown* (1947) 78 Cal.App.2d 609 [178 P.2d 10], the court found Brown assumed the lease liabilities. Brown had accepted the assignment of the lease and took and retained possession of the property. *"Moreover, he acknowledged in writing by means of the letter previously mentioned . . . that he was holding the property as the 'sole lessee.' And he verbally agreed with plaintiffs 'he was going to live up to the terms of the lease, that he was going to continue with the payments.'"* (*Id.* at p. 617; italics added.)

In *Flynn v. Mikelian* (1962) 208 Cal.App.2d 305 [25 Cal.Rptr. 138], the court found an express assumption of the obligations pursuant to a written agreement. The court stated: "The lease contained a provision which was in part as follows: 'Lessee shall not assign this lease . . . without the written consent of lessor first had and obtained, and a consent to one assignment . . . shall not be deemed to be a consent to any subsequent assignment. . . .' Such written consent to the assignment to the plaintiffs was obtained. In the document in which such consent was evidenced was an agreement executed by the plaintiffs whereby they did 'agree to be bound by the terms, conditions and covenants [of the lease] . . . , the same as if originally executed by them as Lessees.' . . . *In the document embodying the assignment was an agreement executed by Wright wherein he undertook 'to assume and be bound by all of the terms and conditions of the said Lease which the Lessee therein agrees to be made and performed.'"* (*Id.*, at p. 307; italics added.) And in *Chase v. Oehlke* (1919) 43 Cal.App. 435 [185 P. 425], the court found an express term in writing to pay the rent. "Where, however, as in the instant case, the assignees by express terms in writing covenant and agree to pay the rent reserved in the lease, it presents two sets of obligations and rights: one comprising those due to the relation of landlord and tenant based upon privity of estate, and the other due to privity of contract by the terms of which the obligation of assignees of the lease is to be measured." (*Id.*, at p. 437.) The evidence submitted before the trial court contains no evidence, either oral or in writing, meeting the requirements for an express assumption of the lease terms. Although the addendum says "[s]uch lease should be included as an asset of the corporation" and "[h]owever, the assignability of such lease will be subject to its terms," these words cannot

be stretched into an express assumption of all the terms in the lease. This is plainly an *assignment,* not an *assumption,* of the lease to Tri-Cities as an asset.

The addendum's last sentence, "However the assignability of such lease will be subject to its terms," does not patently or covertly constitute an express assumption of the lease. That sentence was included because the assignor did not have a copy of the lease and did not know whether he had authority to assign it. The language "the assignability of such lease will be subject to its terms" is a reference to the uncertainty as to its *assignability.* It is not an agreement to assume the obligation of the lease.

## III

The second provision of paragraph VI of the lease provides a *warranty by the lessor* to the lessee. If the leased premises are sold at any time the buyer will assume responsibility to perform all the terms of the lease. *This warranty by the lessor to the lessee* does not impose any obligation upon the original lessee. It could not impose any obligation upon an assignee of the original lessee.

Nor does the language of paragraph VII impose any duty upon a nonassuming assignee. Paragraph VII authorizes an assignment with this proviso: "However, Lessee hereby warrants and represents that in the event said assignment shall ever take place, the assignee therein shall assume all of the liabilities and obligations assumed by the Lessee in this Lease Agreement." These plain words impose a duty on the *lessee,* not the assignee. If the lessee failed to perform the duty, then an obligation may arise on his or her part, but certainly absent an express assumption this language creates no privity of contract with Tri-Cities. "An occupant of real property who holds by virtue of a bare assignment of the lease and without entering into any contract, either with his assignor or the lessor, affirmatively binding himself to fulfill the covenants of the lease, is *subject only to such obligations as he impliedly assumes by entry and taking possession of the leased premises." (Realty & Rebuilding Co.* v. *Rea* (1920) 184 Cal. 565, 569 [194 P. 1024]; italics added.)

 Thus, taking possession, without more, does not constitute sufficient evidence to support the finding of an assumption of the lease. Occupation gives rise to an obligation for "covenants which run with the land." (*Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673, 676; *Realty & Rebuilding Co.* v. *Rea, supra,* 184 Cal. 565, 569.)

 Nor does the provision in paragraph IX of the lease, "The assigns and/or heirs of both parties shall carry out the terms of this Lease Agree-

ment," constitute an express assumption of the terms of the lease. Paragraph IX is a contractual obligation of the original lessor and lessee to obtain assumption agreements insofar as are necessary to perform the terms of the lease. It creates no privity of contract with Tri-Cities.

The documents presented to the trial court at the hearing on petition to arbitrate—the purchase and sales agreement, the addendum to the purchase sales agreement and the bill of sale—do not show Tri-Cities to be a party to the lease.

We conclude as a matter of law no evidence was presented to the trial court, documentary or otherwise, to substantiate the conclusion Tri-Cities had assumed the lease. The evidence on point is to the contrary.

## IV

■ Absent an express assumption of the obligations of the lease there is no privity of contract between the original landlords, the Kellys, and the assignee Tri-Cities. An assignee who takes possession under an assignment without an express assumption of the obligation of the lease is not bound by the contractual obligations of the lease. In *Treff* v. *Gulko* (1931) 214 Cal. 591, 595 [7 P.2d 697], the Supreme Court said: "The assignment of the lease here involved . . . contains no covenant on the part of the assignee to pay the rent, and in accepting the same the assignee did not even impliedly agree to pay the rent. He was, of course, liable for the rent so long as he remained in possession of the leased premises, but without any agreement express or implied he could not be held beyond the time of his actual occupation of the premises." (See also *Bonetti* v. *Treat* (1891) 91 Cal. 223 [27 P. 612]; *Timm* v. *Brown, supra,* 78 Cal.App.2d 609, 615.) In *Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673, 675-676, the Supreme Court said: "The lease has a dual character; it is a conveyance of an estate for years, and a contract between lessor and lessee. The result is that dual obligations arise,—contractual obligations from the terms of the lease, and obligations under the law from the creation of the tenancy. As it is sometimes expressed, there are dual obligations arising from 'privity of contract' and 'privity of estate.' [Citation.]

"This dual character of the obligations of a tenant may be illustrated by an assignment of the tenant's right without any assumption of the obligations by the assignee. The assignee who does not assume is not liable on the lease, that is to say, is not bound by its contractual obligations. But the non-assuming assignee who occupies the premises is liable by reason of his tenancy, and his obligation, arising out of privity of estate, continues at least through the period of his occupancy. Likewise, where the new tenant

comes in without even a written assignment, but takes over possession of the old lessee with the consent of the lessor, he is liable for rent." This rule as announced in *Treff* and *Ellingson* is followed by all modern authorities on real property in California. See 4 Miller & Starr, Current Law of Real Estate (§ 27.89, pp. 408-409): "An assignee who takes possession under an assignment without an express assumption of the obligations of the lease is not bound by the contractual obligations of the lease. . . . As long as he remains in possession the nonassuming assignee is bound to pay the rent, maintain the insurance, make repairs, and pay the taxes, if the lease so provides. However, these obligations terminate when the assignee terminates his possession. In the absence of an express assumption of the lease by the assignee there is no privity of contract between the assignee and the landlord, and the assignee is not liable for the covenants which are not otherwise binding under the privity of estate." (Fns. omitted.)

Equally in point and positive are the authorities Johnson-Moskovitz, 6 California Real Estate Law and Practice, section 172.31, page 172.20, where the authors said: "Unless the assignee specifically assumes all of the contractual obligations incident to the lease, his relationship with the original landlord is based only on privity of estate." (Fn. omitted.) And point out further: "Should the assignee abandon the premises or reassign the lease, his privity of estate with the landlord would be divested. Therefore, for example, the assignee's liability for continued rental payments would cease. *Although some commentators have criticized that result, the rule's vitality remains.*" (*Id.*, at pp. 172.21-172.22; fns. omitted.) And the Restatement Second of Property, section 16.1, subdivision (2), states: "A transferee of an interest in leased property is obligated to perform an express promise contained in the lease if:

"(a) the promise creates a burden that touches and concerns the transferred interest;

"(b) the promisor and promisee intend that the burden is to run with the transferred interest;

"(c) the transferee is not relieved of the obligation by the person entitled to enforce it; and

"(d) the transfer brings the transferee into privity of estate with the person entitled to enforce the promise."

The chief authority on real property in the United States, Thompson, states in volume 3A Thompson on Real Property, section 1216 (1959 rev.) page 98: "[I]n the absence of [an] express covenant on his part he [the

assignee] is liable only for such covenants as run with the land and only during such time as he holds the term."

California law is clear: An assignee, in the absence of an express assumption, is liable only for covenants which run with the land and only during the period of his occupancy. His liability "ceases with cessation of possession." (See *Lutton* v. *Rau, supra,* 37 Cal.App. 429, 430-431; *Bank of America etc. Assn.* v. *Moore, supra,* 18 Cal.App.2d 522, 525.) Most often this will involve the covenant to pay rent. The assignee has the obligation to pay the stated rental provided in the lease and not merely the reasonable value of the use. (*Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673.)

We recognize there is a contrary view. The holding in *Treff* is criticized in 3 Witkin, Summary of California Law, Real Property, section 484, pages 2165-2166. Witkin reasons as follows: The "privity of estate" between landlord and tenant does not terminate by mere abandonment, it requires the landlord accept a surrendering of the leasehold. (*Bonetti* v. *Treat, supra,* 91 Cal. 223, 230.) Further, an agreement to pay rent is a covenant running with the land requiring no contractual assumption by the assigns of a tenant. (*Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673, 676.) Witkin then cites the inherent unfairness of a rule forcing a landlord to scrupulously observe the rights of assignees so long as they remain in possession, but allowing assignees to terminate their obligations at their pleasure. This is alleged to be equivalent to a fixed term on the landlord's side and a mere tenancy at will on the tenant's side. Whatever merit there is to this argument, we are bound to follow Supreme Court precedent.

Moreover, the hardship to which Witkin alludes is easily avoided in commercial leases. These are, as was this one, normally prepared to the landlord's specifications and may contain restrictions on assignment without landlord approval to prevent problems such as this. It is the contractual oversight, not the law, which imposes whatever hardship the landlord has incurred.[2]

## V

Two covenants are here sought to be enforced against Tri-Cities, the covenant for rent and the covenant to submit to arbitration. ■ There is no question the lessee's agreement to pay rent is a covenant running with the

---

[2]Apparently the landlord believed the contractual remedy of holding the original lessee to its warranty to obtain an assumption by its assignee was sufficient security. It should have been except for the lessee's later insolvency. Had the lessee never assigned, its insolvency would have left the landlord in the same position it is now.

land, binding upon the assigns of the lessee. An express contractual assumption of an obligation for rent is unnecessary. (See *Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673, 677.)

As to the nature of a covenant to submit to arbitration, case authority is sparse. The only authority found is *Abbott* v. *Bob's U-Drive* (1960) 222 Ore. 147 [352 P.2d 598]. The *Abbott* court held at page 604: "In the case at bar the covenant to arbitrate is invoked to require the lessee to submit to arbitration a matter relating to rental payments under the lease. A covenant to pay rent clearly 'touches and concerns' the land. It would seem to follow that a covenant to arbitrate a question with respect to rental payments should also be required as relating to the property interests of the original covenanting parties as lessor and lessee. As stated in Clark, *op. cit. supra,* page 99 [Clark, Covenants and Interests Running with Land (2d ed)], 'there would seem to be no reason for applying the rules of touching and concerning in an overtechnical manner, which is unreal from the standpoint of the parties themselves.'" The Oregon Supreme Court concluded a covenant to arbitrate was a covenant running with the land. ■ We agree and would treat it as similar to a covenant to pay rent upon which it rests for the conclusion that such a covenant "touches and concerns the land."

The rule relied on in 3A Thompson on Real Property, *supra,* is again applicable to the covenant to arbitrate. "In the absence of an express covenant on his part he [the assignee] is liable only for such covenants as run with the land and only during such time as he holds the term." (§ 1216, p. 98.)

This rule is based upon privity of estate, not privity of contract. When the privity of estate no longer exists, those covenants running with the land, based upon that privity, are no longer enforceable. Thus the covenant to arbitrate is binding upon a nonassuming assignee only as to matters arising during the term or period that the assignee was bound by privity of estate. No authorities predict an agreement to arbitrate could be stretched to require arbitration of a claim for rent due after the premises had been abandoned, after the privity of the estate has been broken.

■ The evidence before the trial court as to Tri-Cities' period of occupancy of the leased plot was, at most, "from September, 1975, to late June, 1977." The arbitrator, proceeding on the erroneous premise there had been an "assumption" of the lease term by Tri-Cities, made no award for the period of actual occupancy but awarded prospective damages "for rent from January 1979 to September 30, 1980" of $16,500 and "for the remaining term of the lease" the arbitrator awarded a monthly charge of $800 (part B of the award).

On all counts, the arbitrator's award was contrary to law, the errors are patent on the face of the award. Tri-Cities can be held responsible only during such time as it held the term. That liability is limited to the *then* (Sept. 1975—June 1977) dollar value of the radio time agreed to be given in lieu of a monetary rent and only for the months of actual occupancy.

Judgment reversed with directions to deny confirmation of the arbitrator's award.

Work, J., and Joseph, J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 14, 1983.

---

*Assigned by the Chairperson of the Judicial Council.