185 Cal.App.4th 23 (2010)
110 Cal. Rptr. 3d 149
VILLA VICENZA HOMEOWNERS ASSOCIATION, Cross-complainant and Respondent,
v.
NOBEL COURT DEVELOPMENT, LLC, Cross-defendant and Appellant.
No. D054550.
Court of Appeals of California, Fourth District, Division One.
May 27, 2010.
*26 Luce, Forward, Hamilton & Scripps, Charles A. Bird; Allen Matkins Leck Gamble Mallory & Natsis and Valentine S. Hoy VIII for Cross-defendant and Appellant.
Epsten Grinnell & Howell, Jon H. Epsten, Douglas W. Grinnell and Anne L. Rauch for Cross-complainant and Respondent.

OPINION
BENKE, Acting P. J.
In this case the developer of a condominium project recorded a declaration of covenants, conditions and restrictions (CC&R's) which required a homeowners association arbitrate any construction defect claim the association might have against the developer. As we explain more fully below, we find CC&R's are not an effective means of obtaining an agreement to arbitrate a homeowners association's construction defect claims against a developer.
Although both federal and state law favor the enforcement of arbitration agreements, neither federal nor state law countenance imposition of arbitration where no agreement to waive judicial remedies exists. Admittedly, in other circumstances our cases and Civil Code section 1354 treat CC&R's as equitable servitudes which bind homeowners and homeowners associations with respect to claims they may have against each other. This treatment of CC&R's is not based on any determination the parties bound by them are in privity of contract with either their co-owners or a homeowners association. Rather, CC&R's are made binding in disputes between homeowners or between homeowners and a homeowners association because of their shared and continuing interest in the equitable and efficient operation of common interest developments. Here, the recorded CC&R's, standing alone, are not a contract between the developer and the homeowners association, which only came into existence after the CC&R's were recorded. Thus here there has been no showing the association entered into a binding arbitration agreement. Accordingly, the trial court did not err in denying the developer's motion to compel arbitration.

FACTUAL AND PROCEDURAL BACKGROUND
Nobel Court Development, LLC (Nobel), purchased the 418 apartments, common areas, and common facilities which make up the Villa Vicenza project *27 in 2004 and converted the apartments to condominiums in 2005. In the course of making the property a condominium project, Nobel recorded CC&R's under which the Villa Vicenza Homeowners Association (the Association) came into existence upon the sale of the first condominium. By deed Nobel also transferred ownership of the common areas and common facilities to the Association. No consideration was provided by the Association to Nobel and the Association did not execute any documents in favor of Nobel in connection with the deed transferring the common areas and common facilities to the Association. In pertinent part, the CC&R's require both condominium owners and the Association arbitrate any claims they have against the developer.
Because following the first sale Nobel controlled the board of directors of the Association and because the initial condominium buyers noticed defects in common areas and common facilities and did not believe Nobel had provided a reserve fund sufficient to repair the defects, the condominium owners brought a derivative action on behalf of the Association against Nobel.[1] Later, an independent litigation committee of the Association was appointed and filed a cross-complaint against Nobel. The committee alleged claims for breach of implied warranty, strict liability, negligence and as the third party beneficiary of express and implied warranties Nobel made to individual homeowners. Following unsuccessful efforts to mediate the Association's claims, Nobel filed a motion to compel arbitration under the provisions of the CC&R's. The trial court denied the motion with respect to the bulk of the Association's claims, but compelled arbitration of the express warranty claims. Nobel filed a timely notice of appeal. (Code Civ. Proc., § 1294, subd. (a).)

DISCUSSION

I
Because the trial court did not consider any disputed extrinsic evidence or otherwise resolve any disputed factual issues, we review its order on Nobel's motion to compel arbitration de novo. (Giuliano v. Inland Empire Personnel, Inc. (2007) 149 Cal.App.4th 1276, 1284 [58 Cal.Rptr.3d 5].)

II
(1) Both the Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) and its California counterpart, the California Arbitration Act (Code Civ. Proc., § 1280 *28 et seq.; CAA), make arbitration agreements enforceable and indeed favor them. (See Moses H. Cone Hospital v. Mercury Constr. Corp. (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 103 S.Ct. 927]; Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1074-1075 [90 Cal.Rptr.2d 334, 988 P.2d 67].) However, under both the FAA and the CAA, the question of whether a party has in fact entered into an arbitration agreement is determined by reference to state law principles governing the formation of contracts. (See First Options of Chicago, Inc. v. Kaplan (1995) 514 U.S. 938, 942 [131 L.Ed.2d 985, 115 S.Ct. 1920]; Marsch v. Williams (1994) 23 Cal.App.4th 250, 254-255 [28 Cal.Rptr.2d 398].)
Here, we do not believe the CC&R's Nobel recorded represent a binding agreement on the part of the Association to arbitrate its construction defect claims against Nobel. In reaching this conclusion we consider our recent holding in Treo @ Kettner Homeowners Assn. v. Superior Court (2008) 166 Cal.App.4th 1055, 1066-1067 [83 Cal.Rptr.3d 318] (Treo), and the provisions of Civil Code section 1354. Although, as we explain, the holding in Treo is not directly applicable to the arbitration provisions of the CC&R's, the principles it discusses inform our analysis of the separate question of whether an agreement to arbitrate exists.

1. Treo

In Treo the developer of condominium project recorded CC&R's which made all disputes between the developer and the homeowners association subject to a judicial reference under Code of Civil Procedure section 638. The homeowners association sued the developer for construction defects and the developer moved to have the matter determined by a referee under Code of Civil Procedure section 638. The trial court granted the developer's motion and the homeowners association filed a petition for a writ of mandate. We issued the writ.
Because a reference under Code of Civil Procedure section 638 effectively waives a party's constitutional right to a jury trial, we found that under Grafton Partners v. Superior Court (2005) 36 Cal.4th 944, 950-952 [32 Cal.Rptr.3d 5, 116 P.3d 479] (Grafton), no agreement to such a reference can be found absent actual notice to the party to be bound and meaningful reflection. (Treo, supra, 166 Cal.App.4th at pp. 1066-1067.) In Grafton the plaintiff had retained an accounting firm. The firm's engagement letter required that, in the event of a dispute, the parties would waive their right to a jury. The Supreme Court found this agreement was not enforceable because the Legislature has not expressly authorized such a prelitigation waiver of the *29 "inviolate right" to a jury trial as required by article I, section 16 of the California Constitution. (Grafton, supra, 36 Cal.4th at p. 951.) The court found this constitutional limitation on permissible jury waivers exists because the right to a trial by jury is "`too sacred in its character to be frittered away or committed to the uncontrolled caprice of every judge or magistrate in the State.'" (Id. at p. 956.) Moreover, the court noted that even where a statute permits a jury waiver, the right to a jury is "considered so fundamental that ambiguity in the statute permitting such waivers must be `resolved in favor of according to a litigant a jury trial.'" (Ibid.) Importantly, the court in Grafton noted that the states which have permitted a contractual jury waiver, have imposed a number of procedural safeguards not typical in commercial law, including requirements which place on the party seeking enforcement of a waiver the burden of proving "the waiver clause was entered into knowingly and voluntarily." (Id. at p. 965.)
(2) Having found that under Grafton a jury waiver requires actual notice and meaningful reflection, in Treo we found the constructive notice provided by the CC&R's did not meet those standards: "The difficulty here is the manner in which the `contract' between [the developer] and [the homeowners association] waiving the right to trial by jury came about. As we have noted, an association, with its obligations and restrictions as defined in the CC&R's, essentially springs into existence when there is a conveyance by the developer of a separate interest coupled with an interest in the common area or membership in the association.
"It is at least arguable that there is some meeting of the minds between the developer and the party to whom the first conveyance is made. The problem, however, is that later purchasers and their successors, who will make up almost all association members, effectively have no choice but to accept the CC&R's prepared by the developer, including in this case the waiver of the right to trial by jury.
"We conclude this is not the situation the Legislature contemplated when it enacted section 638 to allow parties to waive by contract the `inviolate' constitutional right to trial by jury. As Grafton suggests, legislatures when providing for the contractual waiver of that right are particularly concerned with the formalities of the process and the actual existence of a mutual agreement to waive the right. [Citation.]
"Treating CC&R's as a contract such that they are sufficient to waive the right to trial by jury does not comport with the importance of the right waived. CC&R's are notoriously lengthy, are adhesive in nature, are written *30 by developers perhaps years before many owners buy, and often, as here with regard to the waiver of trial by jury, cannot be modified by the association. Further, the document is not signed by the parties." (Treo, supra, 166 Cal.App.4th at pp. 1066-1067.)
In finding CC&R's were not a permissible means of obtaining a jury waiver, we recognized that in Villa Milano Homeowners Assn. v. Il Davorge (2000) 84 Cal.App.4th 819, 828-835 [102 Cal.Rptr.2d 1] (Villa Milano),[2] the court reached a contrary conclusion and found that because in other contexts the CC&R's had been treated as binding upon purchasers of interests in common interest developments, the CC&R's could be used to obtain agreements to arbitrate. (Treo, supra, 166 Cal.App.4th at p. 1065.) We declined to follow that aspect of Villa Milano. We noted that Villa Milano was decided before Grafton and further that: "Treating CC&R's as equitable servitudes makes possible the existence of common interest communities because they allow the continued governance of the community when multiple parties own the property and when such ownership changes over time. The very nature, however, of the creation of CC&R's creates a distance in time and control between the parties that are bound by them. While it may be reasonable under such circumstances to bind owners and the association concerning the governance of the community and the placement of restrictions on the use of property, we conclude the Legislature did not intend that CC&R's be sufficient to effectively and permanently waive the constitutional right to trial by jury." (Treo, supra, 166 Cal.App.4th at p. 1067.)

*31 2. Arbitration Agreement

(3) As Nobel points out, where an arbitration agreement is covered by the FAA, the FAA preempts any conflicting state law. (Shepard v. Edward Mackay Enterprises, Inc. (2007) 148 Cal.App.4th 1092, 1097-1099 [56 Cal.Rptr.3d 326].) Thus Nobel argues the jury waiver provisions in the California Constitution we relied on in Treo cannot be used to adversely impact its right to compel arbitration under the FAA.
We agree with Nobel that any purported agreement between it and the Association would be covered by the FAA and that where the FAA applies, the California Constitution cannot be used to treat arbitration agreements differently than other types of agreements. However, the FAA, like the CAA, only imposes arbitration on parties which have agreed to forego resort to judicial remedies. In this regard, while it is true in Treo we found that CC&R's do not meet the particular requirements of the California Constitution, our analysis in Treo of the manner in which CC&R's operate, as well as our further consideration of Civil Code section 1354, persuade us a developer may not obtain any contractual rights, including the right to arbitration, by the simple expedient of recording CC&R's. Neither the circumstances by which CC&R's are recorded nor their controlling impact on disputes between those with an ownership interest in or responsibility for the operation of a common interest development give rise to any sort of binding agreement between developers who have recorded the CC&R's and those who might in the future be burdened by them.

a. FAA Preemption

Nobel notes that by their terms the CC&R's state: "Because many of the materials and products incorporated into the home are manufactured in other states, the development and conveyance of the Property evidences a transaction involving interstate commerce and the Federal Arbitration Act (9 U.S.C. § 1, et seq.) now in effect and as it may be hereafter amended will govern the interpretation and enforcement of the arbitration provisions of this Declaration." The facts set forth in the CC&R's are hardly matters subject to serious dispute. Nobel's condominium project was a substantial multifamily housing development composed of literally hundreds of dwelling units, the construction of which no doubt necessitated myriad contacts with and impacts on interstate commerce. Moreover, it can hardly be a matter of controversy interstate commerce was involved in financing the purchase of hundreds of individual condominiums from Nobel. Thus, the connection between the *32 project and interstate commerce is manifest here and more than sufficient to support application of the FAA.
In this regard the United States Supreme Court's opinion in Citizens Bank v. Alafabco, Inc. (2003) 539 U.S. 52, 55-58 156 L.Ed.2d 46, [123 S.Ct. 2037], is controlling. In Citizens Bank v. Alafabco, Inc., an Alabama borrower entered into a series of debt-restructuring agreements with an Alabama bank. Each of the restructuring agreements contained arbitration provisions. Because the borrower believed the bank had reneged on an agreement to provide the borrower with working capital, the borrower sued the bank, which then moved to compel arbitration.
(4) In finding a connection with interstate commerce sufficient to support application of the FAA, the court found application of the FAA was not "defeated because the individual debt-restructuring transactions, taken alone, did not have a `substantial effect on interstate commerce.' [Citation.] Congress' Commerce Clause power `may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent `a general practice . . . subject to federal control.' [Citations.] Only that general practice need bear on interstate commerce in a substantial way. [Citations.]" (Citizens Bank v. Alafabco, Inc., supra, 539 U.S. at pp. 56-57.)
The court found the debt-restructuring agreements not only involved interstate commerce because of the borrower's substantial interstate business, but also because the restructured debt was secured by all of the debtor's business assets, "including its inventory of goods assembled from out-of-state parts and raw materials. If the Commerce Clause gives Congress the power to regulate local business establishments purchasing substantial quantities of goods that have moved in interstate commerce, Katzenbach v. McClung, 379 U.S. 294, 304-305 [132 L.Ed.2d 290, 85 S.Ct. 377] (1964), it necessarily reaches substantial commercial loan transactions secured by such goods." (Citizens Bank v. Alafabco, Inc., supra, 539 U.S. at p. 57.) The court further found that "were there any residual doubt about the magnitude of the impact on interstate commerce caused by the particular economic transactions in which the parties were engaged, that doubt would dissipate upon consideration of the `general practice' those transactions represent. [Citation.] No elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause." (Id. at pp. 57-58.)
Similarly, here it can hardly be disputed Congress has the power to regulate the sale and financing of a large residential development. The *33 financing alone implicates the use of federally regulated and chartered financial institutions with well-recognized impacts on interstate commerce and thus supports application of the FAA under Citizens Bank v. Alafabco, Inc. In this regard we note that under Civil Code section 1351, subdivisions (a), (j) and (k), creation of the Association and its ownership of common areas and facilities was an integral part of the creation of the condominium project.
(5) Application of the FAA to the transfer of property to the Association prevents us from enforcing restrictions on the use of arbitration in construction defect cases which the Legislature enacted as Code of Civil Procedure section 1298 et seq. (See Shepard v. Edward Mackay Enterprises, Inc., supra, 148 Cal.App.4th at pp. 1097-1101.) "States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause `upon such grounds as exist at law or in equity for the revocation of any contract.' [Citation.] What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful . . . ." (Allied-Bruce Terminix Cos. v. Dobson (1995) 513 U.S. 265, 281 [130 L.Ed.2d 753, 115 S.Ct. 834].) The FAA also prevents us from relying on the jury waiver provisions of the California Constitution to invalidate an arbitration agreement. Those provisions of our Constitution would improperly discriminate against arbitration because they would not necessarily invalidate other portions of an agreement which, although lacking actual notice and meaningful reflection, do not purport to waive the right to a jury.

b. Contract Formation

However, as we have noted, state law does govern the question of whether an agreement to arbitrate has been made. (See First Options of Chicago, Inc. v. Kaplan, supra, 514 U.S. at p. 942; Marsch v. Williams, supra, 23 Cal.App.4th at pp. 254-255.) In this regard we do not believe the Legislature intended CC&R's could be used as a means of creating any continuing contractual rights between the developer of a common interest development and either a homeowners association or individual homeowners.[3]
The express provisions of Civil Code section 1354 state: "(a) The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states *34 otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both.
"(b) A governing document other than the declaration may be enforced by the association against an owner of a separate interest or by an owner of a separate interest against the association."
Our review of the CC&R's Nobel recorded reveals they are consistent with Civil Code section 1354 and state an intent to benefit only the owners of separate units and provide a right of enforcement only to owners and the Association. Thus neither Civil Code section 1354 nor the terms of the Association's CC&R's express any intent to benefit Nobel in its capacity as developer of the project or provide it with any general right to enforce the CC&R's, other than as the owner of unsold units.
The apparent exclusion of nonowners from the benefits of CC&R's is entirely consistent with the cases which have used contract principles to interpret and enforce CC&R's. (See, e.g., Citizens for Covenant Compliance v. Anderson (1995) 12 Cal.4th 345, 349 [47 Cal.Rptr.2d 898, 906 P.2d 1314] [CC&R's need not be referenced nor repeated in each succeeding deed to be enforceable by other owners]; Frances T. v. Village Green Owners Assn. (1986) 42 Cal.3d 490, 512-513 [229 Cal.Rptr. 456, 723 P.2d 573] [CC&R's as contract between homeowner and homeowners association with respect to installation of common area lighting]; Barrett v. Dawson (1998) 61 Cal.App.4th 1048, 1054 [71 Cal.Rptr.2d 899] [CC&R's as contract between neighboring property owners prohibiting use of residential property for business activities]; Franklin v. Marie Antoinette Condominium Owners Assn. (1993) 19 Cal.App.4th 824, 828, 833-834 [23 Cal.Rptr.2d 744].) Each of those cases involved disputes either between homeowners or between homeowners and a homeowners association.
One rationale for excluding nonowners from the benefits of CC&R's can be found in the reasons we were unwilling in Treo to find that CC&R's may be used as a means of waiving the right to a jury. CC&R's are generally, as here, adhesive and unilateral and those bound by their terms may only have constructive notice of those terms and no contractual relationship with the developer who drafted the CC&R's. While, notwithstanding these considerable procedural shortcomings, CC&R's may be a practical and necessary means of nonetheless governing the ongoing relationship between owners of common interest developments or adjoining property (see Citizens for Covenant Compliance v. Anderson, supra, 12 Cal.4th at pp. 360-369), no such practicality or necessity exists with respect to the rights or obligations of developers or other third parties.
*35 (6) A related rationale can be found in historic limitations on the enforceability of covenants running with the land. In that regard, our holding in Kelly v. Tri-Cities Broadcasting, Inc. (1983) 147 Cal.App.3d 666, 678-679 [195 Cal.Rptr. 303], is instructive. In Kelly we held a rental arbitration provision in a lease only bound an assignee of the initial lessee while the assignee was a tenant. We found the agreement to arbitrate in the lease was a covenant which ran with the land because it concerned rent and therefore was a covenant which "`"touches and concerns" the land.'" (Id. at p. 679.) However, we further noted the inherent limitation on the enforceability of covenants running with the land: "This rule is based upon privity of estate, not privity of contract. When the privity of estate no longer exists, those covenants running with the land, based upon that privity, are no longer enforceable. Thus the covenant to arbitrate is binding upon a nonassuming assignee only as to matters arising during the term or period that the assignee was bound by privity of estate. No authorities predict an agreement to arbitrate could be stretched to require arbitration of a claim for rent due after the premises had been abandoned, after the privity of the estate has been broken." (Ibid.)
The requirement that only those in privity of estate may enforce a covenant running with the land is of course related to the requirement that such covenants be "for the direct benefit of the property." (Civ. Code, § 1462.) "A covenant made for the direct benefit of the land is one which is intended to restore to the covenantee or the owner of the land some right with respect thereto which he has parted with . . . for a special purpose. It is, in other words, a covenant for the direct benefit of the estate or interest of the covenantee in the land . . . ." (Sacramento S.F.L. Co. v. Whaley (1920) 50 Cal.App. 125, 130 [194 P. 1054].) Suffice it to say it is difficult to view a covenant which protects Nobel's ability to defend itself against future claims as one which protects Nobel's interest in land, especially here, where Nobel no longer has any interest in the common areas it deeded to the Association.
Also undermining any treatment of CC&R's as creating binding rights in favor of a nonowner such as Nobel is the power to amend the CC&R's found both in Civil Code sections 1355 through 1357 and in section 15.4 of the Association's CC&R's. Section 15.4 of the CC&R's expressly provides that the arbitration provisions of the CC&R's, among other provisions, may be amended unilaterally by the homeowners. While the right of homeowners to make amendments which serve their collective interests and in which they have the exclusive right to participate is desirable from the perspective of efficiently maintaining a common interest development (see Fourth La Costa Condominium Owners Assn. v. Seith (2008) 159 Cal.App.4th 563, 569-570 [71 Cal.Rptr.3d 299]), the right to unilaterally amend is somewhat at odds with the notion CC&R's create contractual obligations in favor of nonowners.
*36 (7) In light of the foregoing, we do not believe that in providing in Civil Code section 1354 that CC&R's be treated as equitable servitudes, the Legislature intended that CC&R's would be used to provide continuing and irrevocable contractual benefits to nonowners such as Nobel. Thus the trial court did not err in denying Nobel's motion to compel arbitration.
Order affirmed.
Nares, J., and McIntyre, J., concurred.
NOTES
[1] The individual condominium buyers also brought claims on their own behalf, and, by way of a prior order, which is not the subject of this appeal, the trial court ordered those individual claims be arbitrated.
[2] Although the court in Villa Milano found CC&R's are an adequate means of creating an arbitration agreement, as we have noted, the court nonetheless found an arbitration agreement set forth in the CC&R's was unconscionable as against a homeowners association which had construction defect claims against the developer of a condominium project.

Applying the well-established two-prong test for unconscionability, the court found that use of the CC&R's was procedurally suspect because it provided no opportunity for negotiation and because the arbitration provision was buried near the end of the 70-page declaration of the CC&R's. (Villa Milano, supra, 84 Cal.App.4th at pp. 828-829.) The court found that the use of the arbitration provision as a means of defeating the right to sue for construction defects was substantively unconscionable because it conflicted with the policy manifested in Code of Civil Procedure section 1298 et seq., which governs arbitration provisions in agreements to convey real property. As the court in Villa Milano noted, Code of Civil Procedure section 1298 sets forth the manner by which the parties to a real estate contract must be given notice of arbitration provisions and Code of Civil Procedure section 1298.7 prevents any such provision from defeating the right to sue for personal injuries or construction and design defects: "Our review of the applicable statutory and regulatory provisions convinces us public policy disfavors the binding arbitration clause in the context of the case before use. With respect to construction and design defect claims, the clause is substantively unconscionable as an attempt to evade the statutory protections of Code of Civil Procedure sections 1298 through 1298.8." (84 Cal.App.4th at p. 833.)
[3] We express no opinion with respect to parties with whom a developer has a contractual relationship.