[No. D049276. Fourth Dist., Div. One. Jan. 4, 2008.]

FOURTH LA COSTA CONDOMINIUM OWNERS ASSOCIATION,
Petitioner and Respondent, v.
BARBARA SEITH, Objector and Appellant.

**COUNSEL**

Feist, Vetter, Knauf and Loy and Alan H. Burson for Objector and Appellant.

No appearance for Petitioner and Respondent.

Opinion

McCONNELL, P. J.—Barbara Seith appeals an order the trial court entered that reduced the percentage of votes necessary to amend the Fourth La Costa Condominium Owners Association's (Owners Association) declaration of covenants, conditions and restrictions (CC&R's) (Civ. Code,[1] § 1356) and bylaws (Corp. Code, § 7515). Seith challenges the order on the grounds the underlying vote was invalid because it was by mail ballot, the ballot was not secret, the Owners Association made an insufficient effort to permit all owners to vote, and there was insufficient evidence of lender acquiescence; the court exceeded its statutory authority and applied an improper standard; certain provisions of the amendment are unreasonable; and section 1356 is unconstitutional as it impairs the obligation of contracts. We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

The 48-unit Fourth La Costa condominium development was governed by CC&R's and bylaws recorded in 1969. Both documents provided they may be amended only by an affirmative vote of not less than 75 percent of the owners.

In 2004 the Owners Association decided the CC&R's and bylaws should be amended because some provisions were superseded by changes in the law, other provisions were ambiguous and had caused confusion, and provisions pertaining to developer rights and obligations no longer applied. In an August 29, 2005 letter to owners, the Owners Association asked for an affirmative vote on the first restated CC&R's, which contain dozens of new provisions and the amendment of numerous original provisions, and on amended bylaws. The letter notified owners of the 75 percent vote requirement, and of an October 1 informational meeting. It requested the return of ballots by October 7.

In a September 2005 newsletter, the Owners Association reminded owners to vote. Many owners did not return their ballots, and on October 11 the Owners Association sent a memorandum and another ballot to each owner who had not voted, and it extended the deadline for voting to October 21.

In February 2006 the Owners Association filed a petition in the superior court for an order under section 1356 to reduce the percentage of affirmative

---

[1] Undesignated statutory references are to the Civil Code.

votes needed to amend the CC&R's. The petition stated 25 owners voted in favor of the amendment, 11 owners voted against it, and 12 owners did not return their ballots. The petition prayed that the first restated CC&R's "be ordered approved based upon the number of affirmative votes actually cast constituting at least a majority of owners."

In July 2006 the Owners Association filed a supplemental petition under Corporations Code section 7515 to reduce the percentage of affirmative votes necessary to approve the bylaws.

Seith owns and leases out two condominiums at Fourth La Costa. She filed a written objection to the petitions on various grounds, including that the proposed amendments imposed "onerous terms and burdens on the leasing of units."

In a tentative ruling, the court granted the petitions. After an August 16, 2006 hearing, the court took the matter under submission. On August 21 it confirmed its tentative ruling.

DISCUSSION[2]

I

*Validity of Vote*

A

1

"[S]ection 1356, part of the Davis-Stirling Common Interest Development Act . . . , provides that a homeowners association, or any member, may petition the superior court for a reduction in the percentage of affirmative votes required to amend the CC&R's if they require approval by 'owners having more than 50 percent of the votes in the association . . . .' [Citation.] The court may, but need not, grant the petition if it finds all of the following:

---

[2] The Owners Association did not file a respondent's brief, and thus we decide the appeal based on the record, the opening brief and any oral argument by Seith. (Cal. Rules of Court, rule 8.220(a)(2).)

Notice was properly given; the balloting was properly conducted [in accordance with all applicable provisions of the governing documents]; reasonable efforts were made to permit eligible members to vote; '[o]wners having more than 50 percent of the votes, in a single class voting structure, voted in favor of the amendment'; and '[t]he amendment is reasonable.' " (*Peak Investments v. South Peak Homeowners Assn., Inc.* (2006) 140 Cal.App.4th 1363, 1366–1367 [44 Cal.Rptr.3d 892], fn. omitted.)

"Viewed objectively, the purpose of . . . section 1356 is to give a property owners' association the ability to amend its governing documents when, because of voter apathy or other reasons, important amendments cannot be approved by the normal procedures authorized by the declaration. [Citation.] In essence, it provides the association with a safety valve for those situations where the need for a supermajority vote would hamstring the association." (*Blue Lagoon Community Assn. v. Mitchell* (1997) 55 Cal.App.4th 472, 477 [64 Cal.Rptr.2d 81].)

Because section 1356 gives the trial court broad discretion in ruling on a petition (§ 1356, subd. (c)), we review its ruling for abuse of discretion. " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].)

2

Seith contends the vote here was not "conducted in accordance with all applicable provisions of the governing documents," as required by section 1356, subdivision (c)(2), because it was by mail ballots. She concedes, however, that there is statutory authority for mail ballots. Corporations Code section 7513, subdivision (a) provides that "unless prohibited in the articles or bylaws, any action which may be taken at any regular or special meeting of members may be taken without a meeting if the corporation distributes a written ballot to every member entitled to vote on the matter."

Seith cites the bylaws as stating they "may only be amended 'at a regular or special meeting of members.' " The bylaws, however, actually provide they "*may* be amended, at a regular or special meeting of the members."[3] (Italics added.) Seith also cites the CC&R's requirement there must be an affirmative "vote" of at least 75 percent of owners. A vote, however, may be made at a meeting or by mail ballots.

---

[3] Technically, the bylaws were amended under Corporations Code section 7515 rather than Civil Code section 1356, as discussed below.

Seith ultimately acknowledges the governing documents did not prohibit mail ballots. She asserts, however, that since the governing documents did not *expressly authorize* mail ballots, and the authority for their use was purely statutory, the vote was not in accordance with the governing documents and the Owners Association was thus precluded from obtaining relief from the supermajority vote requirement under section 1356.

 The interpretation of statutes presents questions of law we review independently. (*Board of Retirement v. Lewis* (1990) 217 Cal.App.3d 956, 964 [266 Cal.Rptr. 225].) Seith cites no authority that supports her position, and we find it unpersuasive. The Legislature intends to allow mail ballots unless they are expressly prohibited by the governing documents, and their use would run afoul of section 1356, subdivision (c)(2) only if the governing documents prohibited their use.

3

Additionally, Seith cites Corporations Code section 7513, subdivision (b), which provides that "[a]pproval by written ballot pursuant to this section shall be valid only when the number of votes cast by ballot . . . equals or exceeds the quorum required to be present at a meeting authorizing the action, and the number of approvals equals or exceeds the number of votes that would be required to approve at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot."

Seith asserts Corporations Code section 7513, subdivision (b) and Civil Code section 1356 have "equal legislative dignity, and neither prevails over the other." She asserts section 1356 "permits the court to ignore supermajority requirements of the association's CC&R's, but it does [not] permit the court to ignore express provisions of other statutes. By granting the petition under [section] 1356 where the vote was only valid because of the provisions of [Corporations Code section 7513, subdivision (a)], the court disregarded the express language of [Corporations Code section 7513, subdivision (b)], which here mandates 75 [percent] owner approval." In other words, Seith again takes the position that when mail ballots are used an association may never petition under section 1356 for relief from a supermajority vote requirement.

 We disagree. As the court explained in its order, "the relief requested in the petition is exactly the type for which judicial intervention under Civil Code [section] 1356 is deemed proper as only 69 [percent] of the owners have responded despite the efforts of the [Owners] Association to increase participation." There is no suggestion the Legislature intended to limit the reach of section 1356 to votes taken at a regular or special meeting, and we

see no reason for such a distinction. If an election is held at a meeting, the governing documents may be amended only if the percentage of affirmative votes required by the governing documents is cast, or the association obtains relief under section 1356. As there is no evidence of legislative intent to the contrary, the same rule should apply to votes by mail ballot.

### B

Alternatively, Seith contends the vote violated section 1355, subdivision (b), under which an amendment to CC&R's is effective only after "the proposed amendment has been distributed to all of the owners of separate interests in the common interest development by first-class mail postage prepaid or personal delivery not less than 15 days and not more than 60 days prior to any approval being solicited." Seith complains that the Owners Association distributed the proposed amendment and ballots at the same time, and thus gave owners an unreasonably short time within which to evaluate the issues and mount an opposition.

Subdivision (b) of section 1355, however, is inapplicable. Subdivision (a) of section 1355 provides the "declaration may be amended pursuant to the governing documents *or* this title [div. 2, pt. 4, tit. 6, of the Civ. Code, 'Common Interest Developments']. *Except as provided in Section 1356,* an amendment is effective after . . . the approval of the percentage of owners required by the governing documents has been given." (Italics added.) The Owners Association proceeded under its governing documents, not section 1355, and when a supermajority affirmative vote was not cast, it proceeded under section 1356.

Seith asserts the vote here was pursuant to division 2, part 4, title 6 of the Civil Code, and not the governing documents, because the vote was by mail ballots instead and a supermajority affirmative vote was not cast. As discussed, however, Corporations Code section 7513, subdivision (a) authorized the mail ballots. Further, the lack of a supermajority affirmative vote does not mean the vote was not conducted under the governing documents within the meaning of Civil Code section 1356, subdivision (c)(2). Rather, the lack of a supermajority affirmative vote made a petition for relief under section 1356 appropriate.

### C

Further, Seith contends the vote was invalid because it was not by secret ballot. She cites section 1363.03, subdivision (b), which provides that "[n]otwithstanding any other law or provision of the governing documents, elections regarding . . . amendments to the governing documents . . . shall be held

by secret ballot in accordance with the procedures set forth in this section." The statute is inapplicable, however, because it was not effective until July 1, 2006, nearly nine months after the vote here. Contrary to Seith's view, the dates of filing of the Owners Association's petitions and the trial court's order are immaterial. At the relevant time, the Owners Association was not required to conduct the vote by secret ballot. Indeed, Seith concedes the legislative history shows that before the enactment of section 1363.03, ballots in common interest developments were not required by law to be secret.

## D

Seith also contends the vote is invalid because there is insufficient evidence of acquiescence by lenders. The original CC&R's provided that in addition to a supermajority vote of owners, they may be amended "provided written notice of the proposed amendment is sent to all lenders and a written consent is obtained of seventy-five percent . . . of the lenders holding the beneficial interests in any Mortgages or Trust Deeds of record as valid liens against said project or any portion thereof, provided, however, that the lender shall not unreasonably withhold their consents."

The Owners Association's original petition averred that through its legal counsel it "mailed letters and ballots to the holders of the Mortgages as required [by] . . . the CC&Rs. These letters were sent via Certified Mail, Return Receipt Requested ('RRR') and the letter informed the Mortgagees that the signature on the RRR would be deemed consent of the proposed [amended] CC&Rs, unless a ballot was returned within thirty . . . days. . . . As of February 8, 2006, over 75 [percent] of the Mortgagees had signed the RRR. One . . . lender indicated that it could not consent because it did not have a copy of the original CC&Rs." The petition included a copy of the letter and the ballot sent to the lenders.

As the court noted, the CC&R's required an affirmative vote of owners, but only written consent by lenders. The court explained that "[t]his would tend to indicate that the CC&R's, as originally drafted, contemplated a distinction between the forms of approval required from each group, with the approval from the latter group being more relaxed in form. The CC[&]R's did not specify the method by which the consent may be obtained. [The Owners Association's] method of assuring receipt of the proposed changes by the lenders and thereafter providing them with 30 days within which to reject the changes is as good as any." We agree with the court's assessment.

## E

■ Seith also contends the Owners Association violated section 1356, subdivision (c)(3), which requires an association to make a "reasonably diligent effort . . . to permit all eligible members to vote on the proposed amendment."

In support of its petitions, the Owners Association submitted the declaration of Ashley Rosas, a management consultant who oversees its day-to-day operations. The declaration stated the Owners Association maintains a list of all current record owners, and Rosas's staff used the list to mail the proposed CC&R's and ballots to owners on August 29, 2005. The declaration also stated that in mid-September a reminder memorandum was sent to owners who did not respond, another reminder was included in the Owner Association's September newsletter, on October 1 it conducted a special meeting regarding the proposed amendment, and on October 11 another reminder and ballots were sent to owners who had still not responded.

Seith submits that "further solicitation [of owners who did not vote] was likely [to lead] to outright defeat," and thus the Owners Association had "no incentive to seek more votes." Seith submitted no evidence pertaining to the Owners Association's motives, and her position is mere speculation. Perhaps, as Seith asserts, it would not have been onerous for the Owners Association to try to reach by telephone the 12 owners who did not vote. We conclude, however, that its efforts were sufficient to satisfy section 1356, subdivision (c)(3). The vote was valid.

## II

### *Trial Court's Statutory Authority*

#### A

Next, Seith contends the trial court exceeded the authority of section 1356, subdivision (d), which provides: "If the court makes the findings required by subdivision (c), any order issued pursuant to this section may confirm the amendment as being validly approved on the basis of the affirmative votes actually received during the balloting period or the order may dispense with any requirement relating to quorums or to the number or percentage of votes needed for approval of the amendment that would otherwise exist under the governing documents."

The proposed amendment to the CC&R's changes the supermajority vote for their amendment to a majority vote. The original CC&R's, however,

provided they "shall not be amended to allow amendments by vote of less than seventy-five percent . . . of the Owners." Seith asserts the original CC&R's may never be amended to allow a majority vote.

█ The issue is one of contract interpretation. "The same rules that apply to interpretation of contracts apply to the interpretation of CC&R's." (*Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1377 [50 Cal.Rptr.3d 40].) " 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citation.] 'Where the language of a contract is clear and not absurd, it will be followed.' " (*Templeton Development Corp. v. Superior Court* (2006) 144 Cal.App.4th 1073, 1085 [51 Cal.Rptr.3d 19]; see § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].)

At the trial court, the Owners Association argued the original CC&R's unreasonably restricted it from amending the document, and requiring it to obtain the approval of 75 percent of owners "for each and every amendment, stagnates [it] from being able to update the CC&Rs and to reflect the desires of the community. The fact that the CC&Rs have not been amended since 1969 is proof of the unreasonable hold the current amendment provision has on this community."

The court found reasonable the provision of the first restated CC&R's to allow a majority vote to amend the document, and we agree. It would be rather absurd to allow the governing documents to restrict an association's ability to amend the document in perpetuity, even if, for instance, 100 percent of the owners preferred a majority vote rather than a supermajority vote. Accordingly, the court did not exceed its authority under section 1356 by approving the majority vote amendment.

B

Seith also contends the court exceeded its authority under section 1357. Under subdivision (a) of section 1357, the Legislature "finds and declares that it is in the public interest to provide a vehicle for extending the term of the declaration if owners having more than 50 percent of the votes in the association choose to do so." Subdivision (b) of section 1357 provides that a "declaration which specifies a termination date, *but which contains no provision for extension of the termination date*, may be extended by the approval of owners having more than 50 percent of the votes in the association or any greater percentage specified in the declaration for an amendment thereto. If the approval of owners having more than 50 percent of

the votes in the association is required to amend the declaration, the term of the declaration may be extended in accordance with Section 1356." (Italics added.)

Under subdivision (d) of section 1357, "[n]o single extension of the terms of the declaration made pursuant to this section shall exceed the initial term of the declaration or 20 years, whichever is less. However, more than one extension may occur pursuant to this section." Here, the original CC&R's provided for a term of 40 years from the date of recordation, December 9, 1969, but they also provided that after the 40-year period they shall be automatically extended for successive 10-year periods. The first restated CC&R's provide they are in effect until December 31, 2055, after which they shall be automatically extended for successive 10-year periods. Seith asserts the extension to 2055 violates subdivision (d) of section 1357.

■ Section 1357, however, is inapplicable here because the original CC&R's had an automatic renewal provision, and the statute plainly applies only to CC&R's that have a termination date and do not provide for an extension. In enacting the statute, the Legislature was concerned that "there are common interest developments that have been created with deed restrictions which do not provide a means for the property owners to extend the term of the declaration. . . . [C]ovenants and restrictions, contained in the declaration, are an appropriate method for protecting the common plan of developments and to provide for a mechanism for financial support for the upkeep of common areas . . . . If declarations terminate prematurely, common interest developments may deteriorate and the housing supply of affordable units could be impacted adversely." (§ 1357, subd. (a).) Had the Legislature intended to limit the extension of *any* CC&R's to 20-year periods it could easily have said so.

III

*Section 1356's Reasonableness Standard*

Seith contends the trial court violated section 1356, subdivision (c)(5) by not applying a reasonableness standard, and instead applying a deferential standard under *Nahrstedt v. Lakeside Village Condominium Assn., Inc.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*).

In *Nahrstedt,* our high court interpreted section 1354, subdivision (a), under which recorded CC&R's are enforceable equitable servitudes "unless unreasonable." The court held CC&R's are unreasonable if they are "wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit." (*Nahrstedt, supra,* 8 Cal.4th at

p. 382.) The prior version of the statutory provision (former § 1355) stated " 'restrictions shall be enforceable equitable servitudes *where reasonable,*' " and the court concluded the shift from " 'where reasonable' " to the double negative " 'unless unreasonable' " signaled the Legislature's intent to "cloak[] use restrictions contained in a condominium development's recorded declaration with a presumption of reasonableness by shifting the burden of proving otherwise to the party challenging the use restrictions." (*Nahrstedt,* at p. 380, italics added in *Nahrstedt*; see also *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 79 [14 Cal.Rptr.3d 67, 90 P.3d 1223].)

■ We agree with Seith that since section 1356 pertains to *proposed* amendments to CC&R's, rather than recorded CC&R's, and it does not contain the "unless unreasonable" language of section 1354, there is no presumption of reasonableness under section 1356 and the party petitioning for relief from a supermajority vote requirement has the burden of proving reasonableness. The term "reasonable" in the context of use restrictions has been variously defined as "not arbitrary or capricious" (*Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766, 772 [224 Cal.Rptr. 18]; see *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 266 [87 Cal.Rptr.2d 237, 980 P.2d 940]), "rationally related to the protection, preservation and proper operation of the property and the purposes of the Association as set forth in its governing instruments," and "fair and nondiscriminatory." (*Laguna Royale Owners Assn. v. Darger* (1981) 119 Cal.App.3d 670, 680 [174 Cal.Rptr. 136].)

Here, in discussing 11 specific issues Seith raised, on three instances the court found provisions of the first restated CC&R's not "unreasonable." The order, however, also expressly acknowledges section 1356 imposes a reasonableness requirement; it states the "[*p*]*etitioner* has satisfied the elements of . . . section 1356," and the court "finds that all of the proposed changes with which the objecting party takes issue are indeed *reasonable* and that it does not appear that the amendments are for an improper purpose." (Italics added.) Accordingly, the order establishes the court applied the correct burden of proof and a standard of reasonableness.

■ Further, when the court properly places the burden of proof on the party petitioning under section 1356, its finding that a proposed amendment is not unreasonable, as opposed to reasonable, is of no real import. As the court explained in *Nahrstedt,* the differences between the terms "where reasonable" and "unless unreasonable" under section 1354 and its predecessor were germane to the issue of whether there is a presumption of validity and the allocation of burden of proof. A CC&R is unreasonable if it is arbitrary and capricious, violates the law or a fundamental public policy or imposes an

undue burden on property, and it is reasonable unless it meets those criteria. (See 9 Miller & Starr, Cal. Real Estate (3d ed. 2007) § 25B:13, pp. 25B-42 to 25B-43.) We find no error.

## IV

### *Objections to Specific Provisions*

#### A

Seith complains that article IV, section 2(K) of the first restated CC&R's eliminates an owner's right to an assigned parking space in the common area. The original CC&R's provided that the Owners Association "shall" "assign to each Unit . . . the right to use one . . . parking space contained within the Common Area. . . . The [Owners] Association, however, reserves the right to re-assign and re-allocate said parking spaces in such manner and at such time as it may deem reasonably necessary for the benefit of all of the Owners of all of the Units." The first restated CC&R's have the same language, but use the term "may" instead of "shall" with regard to the assignment of common area parking spaces to units.

At the trial court, the Owners Association explained that when the CC&R's were originally adopted in 1969, common area parking spaces had not been assigned to the units, but shortly after their adoption parking spaces were assigned to the units and the assignments continue. The Owners Association argued the previous version was outdated because it no longer has any affirmative duty to assign spaces to the units since that task has been completed.

We disagree with Seith's speculation that under the amendment the Owners Association may take assigned spaces away from units, as it cannot reassign spaces under the first restated CC&R's unless reassignment is necessary for the benefit of all owners. Taking spaces away from owners would not benefit them. Although the amended provision could have been drafted more clearly, under the circumstances we find it reasonable.

#### B

##### 1

Article VI, section 3(A) of the first restated CC&R's states: "Except as may be required by legal proceedings or authorized by the Association's Rules, no commercial signs, billboards, real estate flags or advertising of any

kind shall be maintained or permitted on any portion of the Development except for one 'For Sale' or 'For Rent' sign per Unit, not larger than 18 [inches] by 24 [inches]. The sign must be professionally printed, be maintained in good condition, and may only be posted in the window and may not be posted on the railings of balconies or locations on the buildings. . . . All signs must be removed within three . . . days of close of escrow or lease of the Unit."

Seith contends the provision violates section 1353.6, which, as of January 1, 2004, limits an association's restrictions on *noncommercial* signs. The statute provides: "(a) The governing documents . . . may not prohibit posting or displaying of noncommercial signs, posters, flags, or banners on or in an owner's separate interest, except as required for the protection of public health or safety or if the posting or display would violate a local, state, or federal law. [¶] (b) For the purposes of this section, a noncommercial sign, poster, flag, or banner may be made of paper, cardboard, cloth, plastic, or fabric, and may be posted or displayed from the yard, window, door, balcony, or outside wall of the separate interest . . . . [¶] (c) An association may prohibit noncommercial signs and posters that are more than 9 square feet in size and noncommercial flags or banners that are more than 15 square feet in size."

In enacting the statute, the Legislature intended to provide: " '(a) That homeowners throughout the state shall be able to engage in constitutionally protected free speech traditionally associated with private residential property. [¶] (b) That owners of a separate interest in a common interest development shall be specifically protected from unreasonable restrictions on this right in the governing documents.' " (Historical and Statutory Notes, 8 West's Ann. Civ. Code (2007 ed.) foll. § 1353.6, p. 184.)

In accordance with section 1353.6, article VI, section 3(B) of the first restated CC&R's does allow the display of *noncommercial* signs not exceeding nine square feet "from the yard, window, door, balcony, or outside walls of the Units and must be, made of paper, cardboard, cloth, plastic, or fabric." Seith essentially asserts that for sale and for lease signs should be included within that provision because they are noncommercial, based on a dictionary definition of "commercial" as "engaged in commerce or work intended for commerce." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 249, col. 2.) She asserts that a typical owner is not engaged in buying and selling units, and is thus not engaged in commerce.

■ It is established, however, that signs advertising property for sale or for lease constitute commercial speech as the advertiser's interest is purely economic. (*Linmark Associates, Inc. v. Willingboro* (1977) 431 U.S. 85, 92, 98

[52 L.Ed.2d 155, 97 S.Ct. 1614]; *Kennedy v. Avondale Estates, Ga.* (N.D.Ga. 2005) 414 F.Supp.2d 1184, 1198–1199.) "[C]ommercial speech is that which 'propose[s] a commercial transaction.' " *(Kennedy v. Avondale,* at p. 1198, citing *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 762 [48 L.Ed.2d 346, 96 S.Ct. 1817].) As section 1353.6 pertains only to noncommercial speech it is inapplicable here.

## 2

 Alternatively, Seith contends that even if for sale and for lease signs are commercial, the restrictions on their size and placement violate section 712, subdivision (a), which provides: "Every provision contained in or otherwise affecting a grant of a fee interest in . . . real property in this state . . . , which purports to prohibit or restrict the right of the property owner . . . to display . . . *on the real property,* or on real property owned by others with their consent, or both, signs which are reasonably located, in plain view of the public, are of reasonable dimensions and design, and do not adversely affect public safety, . . . and which advertise the property for sale, lease, or exchange, or advertise directions to the property, by the property owner or his or her agent is void as an unreasonable restraint upon the power of alienation." (Italics added.) A sign may include directions to the property, the owners' or the agent's name, address and telephone number, and it is deemed to be of reasonable dimension and design if it complies with a local sign ordinance. (§§ 712, subd. (c), 713, subd. (a).)

Section 712 applies to the placement of signs on an owner's "real property." In a condominium project, however, unit owners ordinarily have no separate interest in the real property. Subdivision (f) of section 1351 provides: "A condominium consists of an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit, the boundaries of which are described on a recorded final map, parcel map, or condominium plan . . . . The area within these boundaries may be filled with air, earth, or water, or any combination thereof, and need not be physically attached to land except by easements for access and, if necessary, support. . . . The portion or portions of real property held in undivided interest may be all of the real property, except for the separate interests . . . . An individual condominium within a condominium project may include, in addition, a separate interest in other portions of the real property."

Further, the balconies, exterior doors and walls of units are also common areas. Section 1351, subdivision (i) provides: "(i) 'Exclusive use common area' means a portion of the common areas designated by the declaration for the exclusive use of one or more, but fewer than all, of the owners of the separate interests and which is or will be appurtenant to the separate interest

or interests. [¶] (1) Unless the declaration otherwise provides . . . [as here] any shutters, awnings, window boxes, doorsteps, stoops, porches, balconies, patios, exterior doors, doorframes, and hardware incident thereto, screens and windows or other fixtures designed to serve a single separate interest, but located outside the boundaries of the separate interest, are exclusive use common areas allocated exclusively to that separate interest."

Here, the original CC&R's defined a "Unit" as "any portion of a building located on The Properties designed and intended for use and occupancy as a residence . . . , the boundaries of each unit are the interior surfaces of the ceiling, floors, perimeter walls, windows and doors thereof; which . . . boundaries include the air space so encompassed and the portions of the building located within [the] air space." The CC&R's defined "Common area" as "all land and improvements, and all portions of the divided property not located with any unit."

We conclude that under the plain language of section 712, subdivision (a), a condominium owner in a project such as Fourth La Costa has no right to post for sale and for lease advertisements in the common areas. Had the Legislature intended to extend such a right it could have expressly stated so.[4] While an association may not ban such advertisements entirely (see *Linmark Associates, Inc. v. Willingboro, supra*, 431 U.S. 85, 92, 98), to protect all owners it may impose reasonable restrictions for aesthetic purposes (*id.* at p. 93). Here, the amendment allows an owner to post a sign in the window of his or her unit, and it is undisputed that such a sign would be viewable to the public. Seith claims the size restriction of 18 inches by 24 inches "would prohibit the typical professional real estate broker sign," but she did not provide the trial court with any supporting evidence. Moreover, we see no problem with allowing only one sign per unit, or requiring that signs be removed within three days of a lease or sale. Article IV, section 3(A) of the first restated CC&R's is reasonable.

---

[4] Commentators on common interest developments indicate that sections 712 and 713 apply to common interest developments, but they do not discuss any right of owners to place for sale or for lease signs in common areas. (See, e.g., 1 Sproul & Rosenberry, Advising Cal. Common Interest Communities (Cont.Ed.Bar 2007) § 6.7, pp. 389–391 (hereafter Sproul & Rosenberry); Hanna & Van Atta, Cal. Common Interest Developments: Law and Practice (2007) § 22.61, pp. 1675–1678 (hereafter Hanna & Van Atta).) Sproul and Rosenberry explain that "[l]ike so many other Davis-Stirling Act statutory provisions that seek to regulate a subject matter addressed in other California statutes that are applicable to common interest communities, no effort is made to clearly integrate the new statutory rules with pre-existing laws pertaining to the same subject. For example, new [Civil Code section] 1353.6 suggests that governing documents could prohibit any form of commercial expression by signs, banners, and the like, and yet [Civil Code sections] 712 and 713 have for many years prohibited private covenants from prohibiting or restricting the right of owners to display signs of reasonable dimension, design, and location that advertise the owner's property for sale, lease, or exchange." (1 Sproul & Rosenberry, *supra*, § 6.7, pp. 390–391.)

## C

Further, Seith contends article VI, section 1(B) of the first restated CC&R's increases the costs and burdens of owners who lease their units, because it requires leases to be in writing and to state the tenant is bound by the provisions of the CC&R's. At the trial court, the Owners Association explained "there are many situations where a tenant is in violation of the governing documents and notice to the Owner regarding the tenant's violations have gone unheeded." The Owners Association sought written leases to ensure that provisions of the CC&R's are contained in the lease, as lessees would not otherwise be bound to follow them. "When the declaration permits leasing, a community association faces enforcement problems if an owner's tenant engages in conduct that violates other declaration provisions." (1 Sproul & Rosenberry, *supra*, § 6.45, p. 423.) Article VI, section 1(B) is reasonable.

Seith claims the provision makes tenants responsible for assessments and maintenance costs and "[n]o tenant in their right mind would agree to undertake that liability." The first restated CC&R's, however, specifies that assessments are the personal obligations of *owners*. The CC&R's pertain to a tenant's conduct insofar as permitted uses are concerned. For instance, with limited exception each residence may be used only for residential purposes, each residence may have only a reasonable number of pets, and no temporary structures are allowed. Potential tenants should not be concerned about any liability for assessments against an owner.[5]

## V

### *Amendment of Bylaws*

The original bylaws, adopted in 1969, provided they could be amended by a vote of not less than 75 percent of all votes entitled to be cast. In its supplemental petition, the Owners Association sought a reduction in the percentage of required votes. It cited Corporations Code section 7515,

---

[5] Seith also challenges the reasonableness of article V, section 8 of the first restated CC&R's, which authorizes the collection of interest on unpaid assessments; and article V, section 9, which pertains to the recordation of liens for delinquent assessments. She did not, however, address those provisions at the trial court. "As a general rule, failure to raise a point in the trial court constitutes . . . waiver and appellant is estopped to raise that objection on appeal." (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].) The first restated CC&R's contain dozens of new provisions and amended provisions, and the trial court could not be expected to comb through them and independently research each one to determine its reasonableness. It was incumbent on Seith to raise all objections she had.

subdivision (a) which provides: "If for any reason it is impractical or unduly difficult for any corporation to call or conduct a meeting of its members, . . . or otherwise obtain their consent, in the manner prescribed by its articles or bylaws, or this part, then the superior court . . . , upon petition . . . , may order that such a meeting be called or that a written ballot or other form of obtaining the vote of members . . . be authorized, in such a manner as the court finds fair and equitable under the circumstances."

The statute further provides: "The order issued pursuant to this section may dispense with any requirement relating to the holding of and voting at meetings or obtaining of votes, including any requirement as to quorums or as to the number or percentage of votes needed for approval, that would otherwise be imposed by the articles, bylaws, or this part." (Corp. Code, § 7515, subd. (c).) As with Civil Code section 1356, Corporations Code section 7515 is intended to "overcome membership voting apathy." (*Greenback Townhomes Homeowners Assn. v. Rizan* (1985) 166 Cal.App.3d 843, 849 [212 Cal.Rptr. 678].)

■ Seith asserts Corporations Code section 7515 authorizes the court to order only a prospective vote, and it erred by approving a vote retrospectively. In rejecting that interpretation, commentators have explained: "Corporations Code [section] 7515[, subdivision] (a) seems prospective in permitting the court to order 'that such a meeting be called or that a written ballot . . . be authorized in such a manner as the court finds fair and equitable.' Under this interpretation the court could act prospectively to relax voting or meeting requirements only as they apply to meetings or requests for member approvals that occur after the association has failed in its efforts to obtain member approvals or to conduct meetings in accordance with applicable bylaw, article, or statutory requirements. Corporations Code [section] 7515[, subdivision] (c), however, permits the order to 'dispense with any requirement relating to the holding of and voting at meetings or obtaining of votes.' Thus, a more reasonable interpretation of [section] 7515 would be that the court may, as empowered under [Civil Code section] 1356 with regard to the declaration, retroactively approve amendments to the articles and by-laws." (2 Sproul & Rosenberry, *supra*, § 9.44, pp. 682–683.)

We agree with that assessment, particularly since Civil Code section 1356, which applies to the amendment of CC&R's, was patterned after Corporations Code section 7515. (2 Sproul & Rosenberry, *supra*, § 9.30, p. 660.) The Owners Association established the apathy of a substantial percentage of owners and that the supermajority requirement precluded it from amending the bylaws as well as the CC&R's. We are unaware of any reason to allow relief from the supermajority vote requirement *after* a vote has already been taken in the context of CC&R's—which are central to the establishment,

operation and maintenance of a common interest development and ordinarily control in the event of a conflict with the bylaws (Hanna & Van Atta, *supra*, § 1.30, pp. 28–29; *id.*, § 18:19, pp. 1103–1104)—but only allow prospective relief in the context of bylaws. We find no error.

## VI

### *Constitutionality of Section 1356*

#### A

Seith contends that as applied retroactively to the original CC&R's, section 1356 is an unconstitutional impairment of the obligation of contracts.[6] Article I, section 10 of the United States Constitution states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Article I, section 9 of the California Constitution provides: "A . . . law impairing the obligation of contracts may not be passed."

 "The language of these constitutional provisions 'appears unambiguously absolute . . . .' [Citation.] However, the provisions have not been so treated by the courts. 'Read literally, these provisions appear to proscribe any impairment. However, it has long been settled that the proscription is "not an absolute one and is not to be read with literal exactness like a mathematical formula." [Citation.]' " (*Hall v. Butte Home Health, Inc.* (1997) 60 Cal.App.4th 308, 318 [70 Cal.Rptr.2d 246].)

"As the United States Supreme Court has interpreted the federal contracts clause, contracts clause questions turn on a three-step analysis. [Citation.] The first and threshold step is to ask whether there is any impairment at all, and, if there is, how substantial it is. [Citation.] If there is no 'substantial' impairment, that ends the inquiry. If there is substantial impairment, the court must next ask whether there is a 'significant and legitimate public purpose' behind the state regulation at issue. [Citation.] If the state regulation passes that test, the final inquiry is whether means by which the regulation acts are of a 'character appropriate' to the public purpose identified in step two." (*Barrett v. Dawson* (1998) 61 Cal.App.4th 1048, 1054–1055 [71 Cal.Rptr.2d 899].) The same analysis is applicable to the state Constitution's contract clause. (61 Cal.App.4th at p. 1056.)

"The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." (*Home Bldg. & L. Assn. v. Blaisdell*

---

[6] Seith also contends Corporations Code section 7515 impairs the obligations of contracts, but she did not preserve the issue for appellate review by raising it at the trial court. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

(1934) 290 U.S. 398, 431 [78 L.Ed. 413, 54 S.Ct. 231].) For instance, a law that discharged a debtor from liability was held invalid as applied to contracts in existence when the law was passed. (*Ibid.*)

■ The Legislature has applied the Davis-Stirling Common Interest Development Act (§ 1350 et seq.) "both prospectively and to existing documents." (2 Sproul & Rosenberry, *supra*, § 9.47, p. 693.) To any extent the reduction in the percentage of affirmative votes required to amend CC&R's may be said to substantially impair preexisting contract rights, there is no unconstitutionality because the statutes have a significant and legitimate public purpose and act by appropriate means. (*Barrett v. Dawson, supra*, 61 Cal.App.4th at p. 1055.) ■ " ' "[A]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." ' " (*Hall v. Butte Home Health, Inc., supra*, 60 Cal.App.4th at p. 322.)

Section 1356 is intended "to give a property owners' association the ability to amend its governing documents when, because of voter apathy or other reasons, important amendments cannot be approved by the normal procedures authorized by the declaration. [Citation.] In essence, it provides the association with a safety valve for those situations where the need for a supermajority vote would hamstring the association." (*Blue Lagoon Community Assn. v. Mitchell, supra*, 55 Cal.App.4th at p. 477.) Owners have a substantial interest in the long-term viability of a condominium project, and that interest is not served when a supermajority vote requirement and voter disinterest combine to preclude or unduly hinder an association's efforts to amend outdated governing documents. (See Rest.3d Property, Servitude, § 6.12, com. a, p. 226.)

B

Additionally, Seith claims section 1356 is unconstitutional because it violates owners' procedural due process rights and equal protection rights. The record, however, does not show that Seith raised these issues at the trial court. "Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal." (*Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101 [53 Cal.Rptr.3d 402].) We decline to reach the issues.

## DISPOSITION

The order is affirmed. The Owners Association is entitled to costs on appeal.

Huffman, J., and Nares, J., concurred.