[No. E043932. Fourth Dist., Div. Two. Sept. 5, 2008.]

MISSION SHORES ASSOCIATION, Plaintiff and Respondent, v. DAVID PHEIL, Defendant and Appellant.

790

COUNSEL

Law Firm of Kaiser & Swindells, Raymond T. Kaiser and J. Rodney DeBiaso for Defendant and Appellant.

Peters & Freedman and Laurie S. Poole for Plaintiff and Respondent.

OPINION

**HOLLENHORST, J.**—David Pheil (Pheil) appeals a trial court order that reduced the percentage of votes necessary to amend the Mission Shores Association's (the Association) declaration of covenants, conditions and restrictions (CC&R's). (Civ. Code, § 1356.)[1] Pheil challenges the order on the grounds the trial court erred in finding that (1) the amendment was reasonable (§ 1356, subd. (c)(5)); (2) the balloting conformed to the CC&R's (§ 1356, subd. (c)(2)); and (3) there was no impairment to the security interest of mortgagees (§ 1356, subd. (e)(3)). We affirm the order.

## I.   PROCEDURAL BACKGROUND AND FACTS

The Association is the homeowners association which governs the Mission Shores common interest development (Mission Shores) located in Rancho Mirage and consisting of 168 separate interests (Homes), in addition to common areas and facilities. On May 12, 2004, the CC&R's were recorded for the development.

In 2004, Pheil and his wife decided to purchase a vacation home in Rancho Mirage. At Mission Shores, the developer's agent represented to Pheil and his wife that they would be allowed to rent or lease a home without restriction. According to the applicable CC&R's, an owner may rent to a single family where the rental agreement is in writing and subject to the CC&R's. In reliance on the agent's representation, Pheil and his wife purchased a Home, which they rented, on occasion, to others. As a homeowner, Pheil is a member of the Association.

The board of directors for the Association (Board) is composed of five members, three of which were appointed by the developer. The developer owns 11 of the 168 Homes in the development. Concerned with how some homeowners were renting their Homes, on May 19, 2005, the Board

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

unanimously voted to accept proposed rule 2.10.2 of the CC&R's (Rule 2.10.2), which provided, "No short-term rentals or leases of less than 30 days are allowed." Pheil challenged the rule. This dispute came before Mediator Peter J. Lesser. A July 31, 2006, mediation did not resolve the dispute. On August 23, Pheil, through his attorney, mailed a "Demand for Internal Dispute Resolution" to Attorney James R. McCormick, Jr., an attorney for the Association, with respect to Rule 2.10.2.

In response to the dispute over Rule 2.10.2, the Board decided to amend the CC&R's to provide the same temporal limitation on rentals. Additionally, the proposed amendment granted the Association the right to evict a tenant for breach of the governing documents and to impose the related attorney fees and court costs on the homeowner. On September 28, 2006, the Association mailed a cover letter, voting instructions, official ballot, the proposed amendment to the CC&R's (Amendment), and two envelopes to all members of record of the Association. It presented a "redlined" version of article II, section 2.1 of the CC&R's, showing precisely the language to be added and to be deleted. A deadline of November 13, 2006, was set to return the ballots. The owners were further informed the ballots would be tabulated at the Board meeting on November 15.

Article IV, section 4.4.3 of the CC&R's sets forth the different types of voting "classes." "Class A" consists of members of the Association who own a Home. Of the 168 Homes, 157 had been sold such that there were 157 owner votes. The remaining 11 Homes were still owned by the developer, who was entitled to three "Class B" votes per Home, or a total of 33 developer votes. In order for the Amendment to pass, the Association had to obtain at least 67 percent of the voting power of both classes. Thus, passage of the Amendment required 105 owner votes and 22 developer votes. On November 13, 2006, 132 of the 168 ballots were received. The inspectors of the election opened the ballots and tabulated the results. In the "Class A" category, 93 owner votes were in favor of the Amendment, 28 owner votes were against the Amendment, and 36 owner votes abstained. In the "Class B" category, all 33 developer votes were cast in favor of the Amendment. Because the Amendment garnered only 59 percent of the owner vote, it failed.

On March 8, 2007, pursuant to section 1356, the Association petitioned the trial court for an order reducing the percentage of affirmative votes required for passage of the Amendment and approving the Amendment based upon the number of affirmative votes actually cast constituting at least a majority of each voting class. A hearing date was set for April 9, 2007. The Association filed a notice of hearing, memorandum of points and authorities,

and supporting declarations. Notice of the hearing was mailed to each homeowner of record on March 23, 2007.

Pheil opposed the petition, objecting to the imposition of a 30-day minimum for leases on the grounds that this violated an alleged representation made by the developers of the project when he purchased his Home. In reply, the Association stated the reason for the minimum lease term was to prevent use of any Home as a hotel. The Association provided a declaration from its counsel regarding the prevalence of CC&R restrictions containing a 30-day minimum provision.

At the initial hearing on April 9, 2007, the trial court continued the matter to allow Pheil's counsel to obtain copies of the supporting declarations. The second hearing was continued to allow the Association to hold its election of directors to see if the new Board would want to continue pursuing the petition. During the final hearing on May 25, 2007, the trial court indicated its intent to grant the petition.

By order dated June 12, 2007, the trial court found that the Association had complied with the requirements of section 1356, subdivision (c)(1) through (6) and that granting the petition was "not improper" under section 1356, subdivision (e)(1) through (3). Thus, the trial court granted the petition, which reduced the percentage required to amend the CC&R's. Pheil filed the instant appeal.

## II.  STANDARD OF REVIEW

"[S]ection 1356, part of the Davis-Stirling Common Interest Development Act (the Act), provides that a homeowners association, or any member, may petition the superior court for a reduction in the percentage of affirmative votes required to amend the CC&R's if they require approval by 'owners having more than 50 percent of the votes in the association . . . .' [Citation.] The court may, but need not, grant the petition if it finds all of the following: Notice was properly given; the balloting was properly conducted; reasonable efforts were made to permit eligible members to vote; '[o]wners having more than 50 percent of the votes, in a single class voting structure, voted in favor of the amendment'; and '[t]he amendment is reasonable.' [Citation.]" (*Peak Investments v. South Peak Homeowners Assn., Inc.* (2006) 140 Cal.App.4th 1363, 1366–1367 [44 Cal.Rptr.3d 892], fn. omitted.)

The purpose of section 1356 is to provide homeowners associations with the "ability to amend [their] governing documents when, because of voter

apathy or other reasons, important amendments cannot be approved by the normal procedures authorized by the declaration. [Citation.] In essence, it provides [an] association with a safety valve for those situations where the need for a supermajority vote would hamstring the association." (*Blue Lagoon Community Assn. v. Mitchell* (1997) 55 Cal.App.4th 472, 477 [64 Cal.Rptr.2d 81].)

Section 1356, subdivision (c), gives the trial court broad discretion in ruling on such petition. Accordingly, on appeal, we review the trial court's ruling for abuse of discretion. (*Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 570 [71 Cal.Rptr.3d 299].)

## III. WAS THE AMENDMENT REASONABLE?

Pheil contends that because three of the five seats on the Board were held by representatives of the developer, the developer "in fostering the petition was clearly acting for its own purposes and not [those] of the owners." Specifically, Pheil claims there is no evidence that any individual homeowner complained about the rental of a home without temporal restriction. Instead, Pheil notes the evidence is limited to the vague determination by the Board and the self-serving declaration of the Association's attorney. Given the facts that (1) the Board was controlled by the developer who was behind the petition; (2) this was not a case of homeowner apathy; and (3) the trial court's words suggest that it thought the owners were entitled to a representative board, Pheil argues the trial court abused its discretion in finding the Amendment to be reasonable.

█ Clearly, the Association was charged with the burden of proving the Amendment was reasonable. (*Fourth La Costa Condominium Owners Assn. v. Seith, supra,* 159 Cal.App.4th at p. 577.) "The term 'reasonable' in the context of use restrictions has been variously defined as 'not arbitrary or capricious' [citations], 'rationally related to the protection, preservation and proper operation of the property and the purposes of the Association as set forth in its governing instruments,' and 'fair and nondiscriminatory.' [Citation.]" (*Ibid.*)

Here, the Association argued that the need to restrict rentals to 30 days or more was to ensure the property would not become akin to a hotel. Mission Shores is a residential community. According to the Association's attorney, "The overwhelming majority of the [CC&R's] that [she] review[s], both in preparing restated [CC&R's] and reviewing existing [CC&R's], contain[s] provisions regarding minimum lease terms of thirty (30) days or longer . . . ." As the trial court noted, "these kinds of restrictions are very common. And . . . many counties and cities have these restrictions that essentially when

you rent for less than 30 days, you're essentially operating a hotel in a residential district." Furthermore, the court observed, "there is a movement afoot to restrict homes from being on vacation rentals. It is not just in this project. It is throughout California. [¶] So for example . . . I have a home in San Luis Obispo County and they have a very strict rule about vacation rentals. I was just reading in the paper in Palm Springs they're talking about passing a law restricting rentals to only 30 days or more."

"A CC&R is unreasonable if it is arbitrary and capricious, violates the law or a fundamental public policy or imposes an undue burden on property, and it is reasonable unless it meets those criteria. [Citation.]" (*Fourth La Costa Condominium Owners Assn. v. Seith, supra,* 159 Cal.App.4th at pp. 577–578.) On the record before this court, we cannot find that the imposition of a 30-day minimum lease term is unreasonable. The provision applies to all owners who rent their Homes, the restriction does not violate public policy (see, e.g., *City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1426–1427 [264 Cal.Rptr. 275] [restrictions requiring owner occupancy and forbidding the leasing of units were reasonable in view of the city's redevelopment goals of providing a stabilized community of owner-occupied units for low- and moderate-income persons]), and any burden to enforce the minimum lease term is outweighed by its beneficial value in preserving the residential character of the development.

With cursory argument and no citation to any legal authority, Pheil contends the Amendment is unreasonable because it grants the Association the right to evict tenants for breach of the CC&R's and to impose attorney fees and costs on the owner. "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.) Although we may deem this point waived, we note the Association addressed it on the merits.[2]

■ The Association argues this provision is reasonable. First, the Association notes that associations have been analogized to landlords for purposes of determining tort liability. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499–501 [229 Cal.Rptr. 456, 723 P.2d 573].) As such, if an association is held to a landlord's obligations, it should equally benefit from any rights attributed to the landlord. We agree. Second, the Association argues that any tenant should be bound by the CC&R's to the same extent that the homeowner is bound. In the event the homeowner fails

---

[2] The Association argues that this issue is waived because Pheil failed to raise it in his written opposition. While the Association discounts the fact that Pheil did raise the issue during oral argument before the trial court, we do not.

or refuses to take effective measures to assure his or her tenant is complying with the CC&R's, the Association needs some means to assure compliance. We agree. Third, according to the Association, the enforcement remedies apply to any and all tenants in breach of the CC&R's, and providing the Association with the right to enforce any breach of the CC&R's does not violate public policy. (See, e.g., 1 Sproul & Rosenberry, Advising Cal. Common Interest Communities (Cont.Ed.Bar 2007 supp.) § 6.45, pp. 423–424.) Again, we agree. Nonetheless, in his reply brief, Pheil claims that commentators have criticized provisions allowing associations the right to enforce the CC&R's against tenants as being "unlawful." Reviewing the practice tip referenced by Pheil, we note the commentators merely caution practitioners to consider the risks involved. Specifically, an association may be liable for wrongful eviction given the fact that the association does not have possession of the property, and thus, is not the rightful party to bring the action. (*Id.* at pp. 424–425.)

■ For the above reasons, we find that the trial court did not abuse its discretion in finding the Amendment to be reasonable.

## IV. DID THE BALLOTING CONFORM WITH THE CC&R'S?

■ According to Pheil, subdivision (c)(2) of section 1356 was not complied with because the letter that accompanied the ballot inaccurately portrayed the context of the Amendment and made improper reference to the ineffective rule. In response, the Association argues it complied with the procedures for amending the CC&R's as governed by section 1363.03. According to that section, a secret ballot procedure must be used with a double envelope system, inspectors of the election must be appointed, and the results must be tabulated at a board meeting. (§ 1363.03, subds. (c), (e).) Here, the Association maintains it mailed the Amendment, the ballot, voting instructions, and two envelopes to each of its members. Furthermore, the results were tabulated at the Board meeting.

The Amendment clearly indicated the language to be added and the language to be deleted. Presenting the owners with a redlined version of the proposed Amendment constituted the reasonably detailed form the CC&R's require. While Pheil claims the cover letter accompanying the ballot and other documents misled the owners, we note there is no evidence in the record that supports this claim. Not one owner submitted a declaration claiming he or she voted in a particular way solely due to the information contained in the cover letter. Moreover, as the Association points out, the

cover letter highlighted the fact that the Amendment would provide for a 30-day minimum leasing requirement and the ability of the Association to evict tenants.[3]

Notwithstanding the above, Pheil claims the Association failed to give notice of the election results pursuant to section 1363.03, subdivision (g). That section provides, "The tabulated results of the election shall be promptly reported to the board of directors of the association and shall be recorded in the minutes of the next meeting of the board of directors and shall be available for review by members of the association. Within 15 days of the election, the board shall publicize the tabulated results of the election in a communication directed to all members." The Association does not claim that it gave notice of the election results; however, it does claim the results were reported at the Board meeting on November 15, 2006, and recorded in the minutes of the Board meeting (which are available to each member). Thus, the Association argues that it provided the required notice to its members, but even if it had not, the petition was not precluded. We agree with the Association.

Pheil does not oppose the results of the election. Rather, he opposes the Amendment itself. Pheil does not provide any argument or legal citation to any authority as to the consequences which the Association should suffer given its failure to comply with section 1363.03, subdivision (g). Under the circumstances of this case, we find such failure to be trivial. Accordingly, we cannot agree that such failure should result in precluding the Association from proceeding with its petition. Moreover, we cannot find that the trial court abused its discretion in failing to find that the balloting did not comply with the CC&R's.

## V. DOES THE AMENDMENT IMPAIR THE SECURITY INTEREST OF MORTGAGEES?

In his final contention, Pheil argues that the CC&R's require approval of 51 percent of first mortgagees who have previously requested notification

---

[3] The cover letter provided, in part, the following: "The Association's [CC&R's] currently discuss[] rental of residences in a very broad manner. There are few protections afforded to the Owners against tenants who treat the Association not as their personal home, but instead as a weekend party place . . . . [¶] Enclosed is a proposed amendment of Article II, Section 2.1 . . . . The purpose of the proposed amendment is to further define the rights and obligations of Owners who rent or lease their residences. Among other things and consistent with the current Rules and Regulations, the proposed amendment places a thirty (30) day minimum on any lease and provides the Association with the right, but not the obligation, to evict problem tenants on an Owner's behalf if the Owner refuses to take corrective action."

under two stated circumstances, namely, where any amendment affects the rights or protection granted to mortgagees and where any amendment could result in a mortgage being canceled by forfeiture. He claims the Association failed to give such notice and to obtain such approval. Again, we note that Pheil fails to support his claim with any legal argument with citation of authorities on the points made. His brief reference to section 1356, subdivision (e)(3), is insufficient. Nonetheless, given the fact that the Association addressed the merits of the issue, so will we.

■ Section 1356, subdivision (e)(3), forbids the court from approving any amendment to CC&R's that impairs the security interest of a mortgagee, if approval of a specified percentage of the mortgagees is required under the CC&R's. According to article XIII, section 13.2.2 of the CC&R's, the following amendments require 51 percent approval of the first mortgagees: "(a) Any amendment which affects or purports to affect the validity or priority of Mortgages or the rights or protection granted to Mortgagees, insurers or guarantors of first Mortgages. [¶] (b) Any amendment which would require a Mortgagee after it has acquired a Lot through foreclosure to pay more than its proportionate share of any unpaid Assessment or Assessments accruing before such foreclosure. [¶] (c) Any amendment which would or could result in a Mortgage being canceled by forfeiture, or in a Lot not being separately assessed for tax purposes. [¶] (d) Any amendment relating to (i) the insurance provisions in Article VIII, (ii) the application of insurance proceeds in Article IX, or (iii) the disposition of any money received in any taking under condemnation proceedings. [¶] (e) Any amendment which would subject any Owner to a right of first refusal or other such restriction, if such Lot is proposed to be transferred." The Amendment does not fall under any item in this list.

In his reply brief, Pheil claims the temporal restriction on renting "clearly impacts the ability of owners to pay their mortgages." However, Mission Shores is a residential development. Pheil has not provided any evidence to the contrary. Other than his claim that he was told he could lease or rent his home and that he thereafter on occasion rented it to others, there is no evidence that he needed to borrow money to purchase his home, that he obtained a non-owner-occupied loan, or that he purchased his home with the sole purpose of renting it out to pay the mortgage.

Accordingly, we conclude the trial court did not abuse its discretion in finding that there was no impairment to the security interests of mortgagees.

## VI.   DISPOSITION

The order is affirmed. The Association is entitled to its costs on appeal.

Ramirez, P. J., and King J., concurred.