Filed 4/30/26  Getz v. Serrano El Dorado Owner's Assn. CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

| | |
|---|---|
| DEAN GETZ, Individually and as Personal Representative, etc.<br>          Plaintiff and Appellant,<br><br>          v.<br><br>SERRANO EL DORADO OWNER'S ASSOCIATION et al.,<br>          Defendants and Respondents. | C101412<br><br>(Super. Ct. No. PC20170113) |

This is an appeal by plaintiff Dean Getz (Getz) following a grant of summary judgment in favor of defendants Serrano El Dorado Owner's Association (the HOA) and Serrano Associates, LLC (Serrano Associates) (collectively, defendants).

The underlying litigation concerns the interpretation of recorded covenants, conditions, and restrictions (CC&R's) governing the Serrano El Dorado master-planned community.  Getz, a former homeowner and HOA board member, filed a complaint alleging that the HOA was not complying with its duty to charge assessments to owners of undeveloped property, to the detriment of owners of developed property.  In particular, Getz alleged that the HOA was violating its duty under the CC&R's to cap assessments on developed property owners, and make up any resulting budgetary shortfall through assessments on owners of undeveloped property, for "so long as" some property is

1

"subject to assessment" as undeveloped property, which he construes to mean "so long as [u]ndeveloped [p]roperty exists within the HOA." Defendants moved for summary adjudication, arguing that the intent of the CC&R's was to permanently halt assessments on undeveloped property if the assessments on developed property were sufficient to meet the HOA's budgetary needs in a given fiscal year.

Agreeing with the defendants, the trial court granted summary adjudication on Getz's first cause of action for declaratory relief. Defendants then moved for summary judgment, asserting that Getz's remaining claims were barred by the statute of limitations. The trial court granted summary judgment, finding that the remaining claims were time-barred because the HOA disclosed its interpretation of the CC&R's to affected property owners more than 10 years before the filing of Getz's complaint.

On appeal, Getz argues that the grant of summary judgment should be reversed because the trial court (1) misconstrued the language in the CC&R's related to assessments on undeveloped property, and (2) erred in failing to apply the continuous accrual doctrine to breaches alleged to have occurred within the applicable limitations period. We agree with Getz on both points and therefore reverse the grant of summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Overview of the CC&R's*

The Serrano El Dorado development (the Development) is a master-planned community formed under the Davis-Stirling Common Interest Development Act of 1985 (Civ. Code, § 4000 et seq.). The Development is governed by a Master Declaration of Covenants, Conditions, and Restrictions and Reservation of Easements (CC&R's), recorded in August 1995. Serrano Associates is "the Declarant" under the CC&R's, as successor in interest to the El Dorado Hills Development Company, the initial developer of the project.

2

The Development is administered and maintained by the Serrano El Dorado HOA, which is responsible for maintaining common areas, enforcing the CC&R's, setting budgets, and collecting assessments.  The HOA's authority includes the "power and duty to levy assessments on the Owners of Lots or Parcels in Phases [of the Development] in which assessments have commenced and to collect and enforce payment of such assessments in accordance with the provisions of [the CC&R's]."

The CC&R's define an "Owner" as "the [p]erson or [p]ersons, including Declarant and Merchant Builders,[1] holding a fee simple or long-term ground leasehold interest of [r]ecord to a Lot or Parcel within the Property…."  The terms "Lot" and "Parcel" refer to units within the Property, as shown on a recorded subdivision map, parcel map, or condominium plan.  The "Property" is defined as "that portion of the Overall Property which at any particular time is subject to this Master Declaration [of CC&R's]."

The Overall Property refers to the land owned by the Declarant, which was the subject of a "[s]pecific [p]lan" adopted by El Dorado County, as described in Exhibit A-1 to the CC&R's.  The CC&R's contemplate that the Overall Property will be developed in two or more phases.[2]  The portion of the Overall Property to which the CC&R's initially applied, described in Exhibit A-2 to the CC&R's, is referred to as the "Initial Property."  The CC&R's state that other portions of the Overall Property, not included in the Initial Property, "may be made subject to [the CC&R's] by annexation…."

According to the CC&R's, each Owner of a Lot or Parcel within the Property is a member of the HOA and subject to the CC&R's.  Every member of the HOA has voting rights, including the right to vote for the HOA board of directors.  The voting rights "vest

---

[1]     The term "Merchant Builder" generally refers to a commercial homebuilder.

[2]     A "Phase of Development" is defined as "(i) any portion of the Overall Property designated by Declarant to be a Phase of Development, or (ii) all the real property for which a Final Subdivision Public Report is issued by the [California Department of Real Estate]."  The initial phase, also known as "Phase 1," consisted of 160 lots.

as of the date when the Lots and Parcels to which membership is appurtenant become subject to assessment."**3**

Each Owner of a Lot or Parcel within the HOA covenants and agrees to pay annual assessments to fund the actual and estimated expenses of the common areas ("Common Assessments"). To ensure that the expenses related to particular common areas and improvements are paid only by the Owners who benefit from them, the CC&R's establish separate budgetary components or "Cost Centers" within the HOA. The all-encompassing Cost Center is referred to as the "Master/Basic" budget; it funds the costs of maintaining the master common areas that provide a general benefit to every property. All portions of the Property are obligated to pay assessments to satisfy the Master/Basic cost component.

The CC&R's also establish smaller, enumerated cost centers (e.g., Cost Center 1) to cover the costs of maintaining common areas or improvements that only benefit specific properties within the Development. A Lot or Parcel may reside within multiple cost centers, making it susceptible to assessments under several cost centers. For example, the CC&R's describe the "Phase 1" portion of the Initial Property—i.e., the initial 160 Lots being developed—as subject to assessment for three cost centers: Master/Basic, Cost Center 1, and Cost Center 2. The CC&R's provide that "[o]nly [those] portions of the Property lying within a particular Cost Center shall pay assessments to satisfy that Cost Center Component."

---

**3**     Membership in the HOA originally was set up with three different classes: Class A, Class B, and Class C. Class A members consisted of all Owners, except that the Declarant and Merchant Builders shall be members of Class B, not Class A, so long as Class B continues to exist. Regardless of ownership, the Declarant also is a "Class C" (non-voting) member of the HOA for so long as Class C continues to exist. Section 4.03 of the CC&R's describes how and when the Class B and Class C memberships terminate. The CC&R's provide that Class C membership terminates on the earliest to occur of (i) conveyance of 4,533 lots to Class A members, or (ii) the ninth anniversary of the first close of escrow to a Class A member.

1. Annexation

Article 14 of the CC&R's governs annexation. It provides that "[a]ny or all of the Overall Property may be annexed to and made subject to this Master Declaration," thereby making the annexed property subject to the [CC&R's] and the jurisdiction of the HOA. Those portions of the Overall Property which are annexed and "become subject to [the CC&R's]" subsequent to the Initial Property are referred to in the CC&R's as "Subsequent Phase Property."

Sections 14.02 and 14.03 of the CC&R's describe the authorized methods of annexation. Section 14.02 gives the Declarant and Merchant Builders a unilateral right to annex any portion of the Overall Property without the approval of the HOA, its board, or the members, provided such right is exercised within a specified number of years—five for the Declarant or three for a Merchant Builder—after the "immediately preceding Phase" of Development. In contrast, section 14.03 allows the Declarant to annex real property at any time with the approval of at least two-thirds of each class of membership.

Annexations are accomplished by filing a "Declaration of Annexation," which "adds Subsequent Phase Property ... to the Property" and "extend[s] [the CC&R's] to such real property." Section 14.05 of the CC&R's provides that "[t]he filing of record of said [Declaration of Annexation] shall constitute and effectuate the annexation of the additional real property described therein, and thereupon said real property shall become and constitute a part of [the] Property, become subject to [the CC&R's]..., and become subject to assessment by the [HOA], and the Owners of Lots and Parcels in said real property shall automatically become Members of the [HOA]."

Section 14.11 of the CC&R's describes the effects of annexation. Similar to section 14.05, it provides: "The [r]ecordation of a Declaration of Annexation shall constitute and effectuate the annexation of the annexable property described therein, and thereupon the annexable property shall become and constitute a part of the Properties, and be subject to, and encompassed within, the general plan and scheme of [the CC&R's]

5

…..  Lots and Parcels within the annexed property shall thereupon become subject to [a]ssessment by the [HOA]…, and the Owners of Lots and Parcels within the annexed real property shall automatically become Members of the [HOA]."

> 2.     *Assessments*

Article 6 of the CC&R's governs assessments.  The first section of that article (§ 6.01) describes the covenant and agreement of Owners to pay assessments to the HOA.  It provides:  "Declarant and any Merchant Builder, for each Lot or Parcel owned by Declarant or such Merchant Builder which is subject to assessment, hereby covenants and agrees, and every other Owner of any Lot or Parcel, by acceptance of a deed or other conveyance therefor,….is deemed to covenant and agree to pay [assessments] to the [HOA]" for, among other things, "annual Common Assessments."

Section 6.05 of the CC&R's specifically addresses Common Assessments, i.e., the charges against Owners to defray the expenses of the common areas.  It provides that "[s]ums sufficient to pay [c]ommon [e]xpenses shall be assessed as Common Assessments against the Owners of Lots or Parcels."  It further provides that the common expenses "shall be allocated among the Owners and their respective Lots or Parcels for which Common Assessments have commenced based upon the number of Assessment Units chargeable to each such Lot or Parcel" within a particular cost center, as described in section 6.05, subdivisions (A) through (D).

For developed Property, section 6.05, subdivisions (A) through (D), of the CC&R's generally require the HOA to determine the amount of Common Assessments by dividing the common expenses by the number of Assessment Units within a given cost center.  Thus, the common expenses attributable to the master common areas—referred to as the "General Assessment Component"—"shall be allocated among all the Owners of developed Property based upon the number of Assessment Units chargeable to such

6

Owner."[4]  The common expenses attributable to other cost centers—referred to as the "Cost Center Assessment Component"—shall be allocated among the Owners of developed Lots and Parcels within the respective cost centers.

For undeveloped Property, section 6.05, subdivisions (B), (C), and (D), of the CC&R's provide that the common expenses shall be allocated among Owners of undeveloped Property as "provided in Exhibit D."  In addition, section 6.05, subdivision (B) provides:  "As all or any portion of a Parcel which is included within the Property is subdivided into a Residential Subdivision, such Parcel, or subdivided portion thereof, will cease to be assessed as undeveloped and commence to be assessed [as developed Property], on the first day of the first month following the month in which the first Close of Escrow occurs for the sale of a Lot or Residential Unit in such Residential Subdivision….  As a Parcel which is included within the Property is improved with one or more buildings, such Parcel will cease to be assessed as undeveloped and commence to be assessed [as developed Property], on the first day of the first month following the month in which the first such building is completed.  For purposes of determining Class A and Class B voting rights for undeveloped Property, the undeveloped Property shall be deemed to have the number of Assessment Units the undeveloped Property would have …if developed to maximum density under the zoning laws in effect as of the date this Declaration is recorded."

Section 6.05, subdivision (E), of the CC&R's governs the amount of Common Assessments.  It provides that Common Assessments against Owners shall be levied and

---

[4]      Assessment Units for developed Property are allocated as follows:  One "unit" for each single-family Lot, a fraction of a unit for each dwelling in a multi-family residential building, and pursuant to a formula for commercial and office buildings.

adjusted in accordance with the annual HOA budget, "subject to the provisions of Exhibit D and Section 6.07."**5**

Section 6.06 of the CC&R's states that "Common Assessments shall commence as to each Lot or Parcel in the Property on the first day of the first month following the month in which the first Close of Escrow occurs for the sale of a Lot in a Residential Subdivision."

3.      *Exhibit D to the CC&R's*

Exhibit D to the CC&R's is entitled "Common Assessments so Long as Some Property Is Subject to Assessment as Undeveloped Property."  (Underline and some capitalization omitted.)  As the title implies, Exhibit D delineates how Common Assessments are charged while a portion of the Property is "subject to assessment" as undeveloped Property.

Paragraph 2 of Exhibit D to the CC&R's explains its purpose:  "The purpose and intent of the assessments provided for in this Exhibit are to allocate to undeveloped portions of the Property sufficient portions of the various [cost components], so that so long as portions of the Property are assessed as undeveloped Lots or Parcels, Common Assessments for developed Lots and Parcels shall remain constant in real purchasing power.  To accomplish that objective, the Declarant is willing to accept levels of Common Assessments on undeveloped portions of the Property which, at least during the early phases of development of the Property, may be disproportionately high, taking into account the fact that undeveloped portions of the Property derive little benefit from most of the costs to be defrayed by Common Assessments."

---

**5**      Subject to specified exceptions, section 6.07 limits increases on Common Assessments to 120 percent of the level of Common Assessments levied in the immediately preceding fiscal year.

Exhibit D to the CC&R's achieves this purpose by (i) setting the initial levels of Common Assessments to be levied on the developed portions of the Property when a cost center is created, and then (ii) capping increases in such assessments using a formula tied to the consumer price index (hereafter, the CPI Rate). To address any resulting shortfall between a cost component's budgeted amount and the assessments levied on developed Property at the CPI Rate, Exhibit D requires Owners of undeveloped Lots and Parcels to pay assessments to make up the shortfall. Specifically, Exhibit D provides that the level of Common Assessments "for undeveloped Property within [a cost center] for any fiscal year shall be an amount sufficient to keep [the assessments] for developed Property from exceeding [the CPI Rate] for that fiscal year."

Exhibit D to the CC&R's contains several provisions designed to minimize the level of undeveloped Property assessments. First, Exhibit D provides that the CPI Rate may only increase, not decrease, "so long as any undeveloped Property is being assessed with respect thereto." This prevents developed properties' share of Common Assessments from being unfairly shifted to undeveloped properties. Second, Exhibit D prohibits the HOA from reducing developed Property assessments in a cost center that has a surplus if such property also resides within another cost center that has a deficit. Third, Exhibit D provides that if the assessments levied on undeveloped Property result in surplus funds, Owners of undeveloped Property will be entitled to a reduction and/or refund.

### 4. *Annual Budget Disclosures*

The HOA has statutory and contractual obligations to prepare and distribute annual budgetary documents to Owners within the Development. (Civ. Code, § 5300.) The required budgetary documents include: a year-to-date report on actual performance; a pro forma budget for the upcoming fiscal year; and notice of any change in regular assessments. (Civ. Code, §§ 5300, 5615.) To satisfy these obligations, the HOA

9

prepared annual "[b]udget [p]ackets" and distributed them to Owners in the latter part of each year.

Beginning in 2001, the HOA determined that the cap and subsidy provisions of Exhibit D to the CC&R's—capping assessments on developed property at the CPI Rate and imposing assessments on undeveloped property to make up any shortfall—no longer applied to certain cost centers and notified the affected Owners through the annual budget packets. Thus, between 2001 and 2005, the HOA gave written notice to Owners that assessments in Cost Center 2, Cost Center 3, Cost Center 7, and the Master/Basic cost center were no longer subject to Exhibit D's cap and subsidy arrangement.[6] In other words, the HOA gave notice that Exhibit D no longer applied to the calculation of assessments for those cost centers. The HOA also reflected these changes in the year-end financial statements that were distributed to Owners.

B. *Getz's Complaint*

Plaintiff Getz is a former homeowner and HOA board member. He acquired a residence in the Development in 2011 and served as an HOA board member from May 2014 to June 2016. Getz alleges that during his tenure on the board, he discovered that since at least 2006, the HOA had not been complying with its duty to charge assessments to Owners of undeveloped Property, including Serrano Associates. Getz alleges that, because of this breach of duty, the Owners of developed Property were charged assessments in excess of the CPI Rate, violating the CC&R's.

---

[6] As an example, the HOA's budget packet for 2002 stated: "During the early stages of development, the [HOA's] operation is subsidized by the Declarant[,] Serrano Associates, and merchant builders, through monthly contributions allocated against undeveloped properties. These subsidies continue until all properties within a cost center are subject to common assessments or until the subsidy is no longer required to keep the assessments at or below predefined levels.... [¶] Several cost centers are no longer subsidized through undeveloped lot assessments as all lots are subject to common assessments or the cost center is fully funded at the predefined level without a subsidy."

10

In March 2017, Getz filed a lawsuit against defendants HOA and Serrano Associates. The operative (third amended) complaint alleges three causes of action: for declaratory relief, breach of fiduciary duty, and breach of the CC&R's. Each cause of action is premised on the HOA's alleged failure to collect assessments from Serrano Associates and/or other Owners of undeveloped Property to the detriment of the remaining HOA members. Specifically, the complaint is premised on defendants' failure to (1) cap assessments to Owners of developed Property at the CPI Rate, and (2) impose assessments on undeveloped Property Owners to make up any budgetary shortfall. The claims pertain to four cost centers: Master/Basic, Cost Center 2, Cost Center 3, and Cost Center 7.

The first cause of action, against all defendants, seeks a declaratory judgment that, until the Property is fully developed, the HOA must calculate developed Property assessments by applying the CPI Rate and assessing undeveloped Property for any shortfall in the HOA's annual budget. The second cause of action, against the HOA, seeks to recover damages based on the HOA's breach of fiduciary duty in failing to adequately assess Owners of undeveloped Property, at the expense of developed Property Owners who were charged more than the CPI Rate. The third cause of action, against all defendants, seeks damages based on breach of the CC&R's assessment obligations.

After filing the lawsuit, Getz filed a motion for class certification on his claims against the HOA. The trial court granted the motion, certifying a class consisting of all Owners of developed Property subject to Master/Basic, Cost Center 2, Cost Center 3, and Cost Center 7 assessments for the period of March 16, 2013, to the present.

C. *Motions for Summary Judgment/Adjudication*

As noted, Getz's first cause of action sought a judicial declaration that, as long as undeveloped Property exists, the HOA has a duty to calculate developed Property assessments using the CPI Rate and make up any resulting budgetary shortfall through

11

assessments on undeveloped Property Owners. Each party moved for summary adjudication on the declaratory relief cause of action.

Getz's motion was denied, and the defendants' motions were granted. The trial court held that the CC&R's unambiguously provide that Common Assessments against Owners of undeveloped Property are permanently extinguished if either one of the following two events occurs: (1) there is no longer any undeveloped Property in the cost center, *or* (2) the cost center's annual expenses are fully funded by assessments on Owners of developed Property. The court found Getz's interpretation of the CC&Rs untenable, stating: "Plaintiff's interpretation of the CC&R's largely consists of parsing sentences outside of their context and imprecisely paraphrasing provisions. Moreover, his interpretation would result in an absurdity since [it] would require that undeveloped property always be subject to assessment, even if the various Components were financially self-sufficient without funding from undeveloped property, which money then would need to be refunded to the owners of undeveloped property due to there being surplus funds paid to or accumulated by the HOA."

After prevailing on the declaratory relief claim, the defendants moved for summary judgment on the remaining claims, asserting the claims were barred by the statute of limitations because the undisputed facts showed that between 2002 and 2005, the HOA disclosed to Owners its determination that Exhibit D to the CC&R's cap and subsidy no longer applied.

The motions for summary judgment were heard alongside a separate motion for summary adjudication filed by Getz directed to the question of whether the HOA had a duty to demand that Serrano Associates pay its "fair share of the costs for maintaining improvements to public property."

The trial court granted the defendants' motions for summary judgment, finding that Getz's remaining claims are barred by the statute of limitations. The trial court did

12

not reach Getz's separate motion for summary adjudication, finding it "mooted" by the resolution of the defendants' motions.

Judgment was entered on April 9, 2024, and Getz timely appealed.

DISCUSSION

I

*Standard of Review*

A motion for summary judgment shall be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc.,[7] § 437c, subd. (c).) "Summary adjudication works the same way, except it acts on specific causes of action or affirmative defenses, rather than on the entire complaint. [Citation.] A summary adjudication is properly granted only if a motion therefor completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 464.)

The moving party, whether plaintiff or defendant, initially bears the burden of making a "prima facie showing of the nonexistence of any genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) A plaintiff moving for summary judgment/adjudication meets its burden by "prov[ing] each element of the cause of action entitling the party to judgment on that cause of action." (§ 437c, subd. (p)(1).) A defendant moving for summary judgment can meet its burden of showing that a cause of action has no merit by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (*Id.*, subd. (p)(2).) Once a moving party has met its

---

[7]     Undesignated statutory references are to the Code of Civil Procedure.

burden, the burden shifts to the opposing party to show the existence of a triable issue of material fact.  (*Id*., subd. (p).)

We review rulings on motions for summary judgment and summary adjudication de novo and decide independently whether the undisputed facts warrant judgment for the moving party as a matter of law.  (*DiCarlo v. County of Monterey* (2017) 12 Cal.App.5th 468, 489; *Hartline v. Kaiser Foundation Hospitals, supra*, 132 Cal.App.4th at p. 464.)  In so doing, we liberally construe the evidence in support of the party opposing the motion and resolve any doubts as to the propriety of granting the motion in favor of that party.  (*Quidel Corporation v. Superior Court* (2020) 57 Cal.App.5th 155, 164.)

II

*Summary Adjudication of Declaratory Relief Cause of Action*

Getz argues that the trial court erred in granting defendants' motions for summary adjudication of the first cause of action for declaratory relief because the trial court misconstrued the language in the CC&R's related to Common Assessments.  We agree.

A.      *Additional Legal Background*

An action for declaratory relief is governed by section 1060, which provides in part:  "Any person interested under a written instrument,... or under a contract, or who desires a declaration of his or her rights or duties with respect to another,... may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action…for a declaration of his or her rights and duties…, including a determination of any question of construction or validity arising under the instrument or contract."

" 'Declaratory relief operates prospectively, serving to set controversies at rest before obligations are repudiated, rights are invaded[,] or wrongs are committed.' " (*California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 185; *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 607.) "[T]he remedy is to be used in the interests of preventive justice, to declare rights rather

14

than execute them." (*Travers v. Louden* (1967) 254 Cal.App.2d 926, 931.) In this way, declaratory relief "serves a practical purpose in stabilizing an uncertain or disputed legal relation, thereby defusing doubts which might otherwise lead to ...litigation." (*Kirkwood v. California State Automobile Assn. Inter-Insurance Bureau* (2011) 193 Cal.App.4th 49, 59; cf. *Cordoba Corporation v. City of Industry* (2023) 87 Cal.App.5th 145, 157 [there is no basis for declaratory relief where only past wrongs are involved]; *Baldwin v. Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 407 [same].)

Summary judgment or adjudication "is appropriate in a declaratory relief action when only legal issues are presented for the court's determination." (*California Public Records Research, Inc., supra*, 4 Cal.App.5th at p. 185.) The defendant's burden in a declaratory relief action " 'is to establish the plaintiff is not entitled to a declaration in its favor. It may do this by establishing (1) the sought-after declaration is legally incorrect; (2) undisputed facts do not support the premise for the sought-after declaration; or (3) the issue is otherwise not one that is appropriate for declaratory relief.' " (*Ibid*.)

B.      *Analysis*

The issue presented in this appeal is one of contract interpretation: Whether, under the CC&R's, assessments against Owners of undeveloped Property are permanently extinguished when a cost center's annual budgetary expenses are fully funded by assessments on Owners of developed Property at the CPI Rate.

The parties agree that the key disputed language is contained in Exhibit D to the CC&R's, which is entitled "Common Assessments So Long as Some Property is Subject to Assessment as Undeveloped Property." (Underline and some capitalization omitted.) Paragraph 2 of Exhibit D provides: "The purpose and intent of the assessments provided for in this Exhibit are to allocate to undeveloped portions of the Property sufficient portions of the various [Cost] Components, so that *so long as portions of the Property are assessed as undeveloped Lots or Parcels*, Common Assessments for developed Lots and Parcels shall remain constant in real purchasing power." (Italics added.)

15

Defendants argue that Exhibit D to the CC&R's title and language establishes "a condition subsequent that, when satisfied, renders the CPI Rate obsolete and eliminates any future assessment obligation on Undeveloped Property." Defendants contend that the condition subsequent is the point at which undeveloped Property is no longer " 'subject to assessment' " for a given cost center. Defendants contend that this condition can be met in either of two ways: (1) if the cost center is fully developed such that there is no longer any undeveloped Property, or (2) if the cost center's annual expenses are fully funded by developed Property assessments without any contribution from undeveloped Property. As to the first point, the parties agree that undeveloped Property is not subject to assessment if the applicable cost center is comprised entirely of developed Property. The second point is the source of the dispute.

Defendants contend that the phrase "so long as" portions of the Property are "subject to assessment as undeveloped Property" means Exhibit D to the CC&R's cap and subsidy arrangement ceases to apply—permanently—once a cost center's annual expenses are "fully funded" without contribution from undeveloped Property in a given fiscal year. In other words, "[w]hen undeveloped property is not charged an assessment with respect to a cost center, Exhibit D ceases to apply to that cost center."

In contrast, Getz argues that undeveloped Property becomes "subject to assessment" upon annexation and continues to be subject to assessment as undeveloped Property until it is developed, at which point it is assessed as developed Property. Thus, according to Getz, the plain meaning of the CC&R's is that the HOA is bound by the CPI Rate when fixing assessments for Owners of developed Property "so long as undeveloped Property exists within the HOA." It follows that, so long as undeveloped Property exists, the HOA must assess Owners of undeveloped Property whenever the CPI Rate is not sufficient to meet a given cost center's budgeted expenses.

The trial court agreed with the defendants' interpretation. The court reasoned that the intent of Exhibit D to the CC&R's was to subsidize Owners of developed Property "at

16

the early stages of development" and gradually "phase out" the assessments on undeveloped Property as the revenue generated from developed Property assessments increased. As support for this conclusion, the court relied on (1) the meaning of the phrase "so long as," as signaling a future end date depending upon a stated condition; (2) Exhibit D's mandate that the CPI Rate cannot be decreased "so long as any undeveloped Property is being assessed with respect thereto"; and (3) Exhibit D's requirement that when assessments against undeveloped Property result in a surplus, Owners of undeveloped Property shall be entitled to a refund.

As we explain, we are not persuaded by the trial court's reasoning. Instead, we agree with Getz that the plain language of the CC&R's establishes that the HOA is required to apply Exhibit D's cap and subsidy arrangement for so long as there are undeveloped Lots and Parcels within the HOA.

We begin with the guiding principle that CC&R's are construed using the same rules that apply to the interpretation of contracts. (*Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 575.) The fundamental goal is to give effect to the mutual intent of the parties at the time of contract formation, so far as the same is ascertainable and lawful. (*Ibid*.; Civ. Code, § 1636.)

To ascertain that intent, we look first to the language of the contract, construing the words in the context of the instrument as a whole and the circumstances under which it was made. (*PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 145-146; Civ. Code, § 1639.) We interpret words in the contract in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447; Civ. Code, § 1644.) If the language is clear and explicit and does not involve an absurdity, it will be followed. (*Starlight Ridge South Homeowners Assn.,* at p. 447.)

17

Where, as here, the interpretation of a written instrument depends solely on the terms of the instrument itself, the question is one of law, requiring us to independently interpret its meaning. (*PV Little Italy LLC, supra*, 210 Cal.App.4th at pp. 144-145; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.)

We next turn to the relevant language of the CC&R's, which (all parties agree) requires the HOA to apply Exhibit D "so long as" some portion of the Property is "subject to assessment" as undeveloped Property. Like the trial court, we interpret the phrase "so long as" to be conditional language, signaling that Exhibit D remains in effect only while a stated condition is met. (Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/so%20long%20as [as of Apr. 30, 2026], archived at <https://perma.cc/D6VL-8K2>; Cambridge Dictionary Online (2026) <https://dictionary.cambridge.org/grammar/british-grammar/as-long-as-and-so-long-as> [as of Apr. 30, 2026], archived at <https://perma.cc/WQ94-N5W3>.) In this case, the stated condition is that some portion of the Property is "subject to" assessment as undeveloped Property.

However, we part ways with the trial court (and Defendants) in construing the meaning of the phrase "subject to assessment." The trial court construed this phrase as referring to the act or occurrence of assessment. Under this view, property is "subject to assessment" only for the time that it is being assessed and ceases to be "subject to" assessment if it is not assessed. Consistent with this view, the trial court concluded that undeveloped Property stops being "subject to assessment" if, in a given fiscal year, the cost center's annual expenses are fully funded by developed Property assessments without a contribution from undeveloped Property.

In our view, the phrase "subject to assessment" refers to the property's eligibility for assessment, not the assessment itself. It refers to the HOA's *right* to assess the property, regardless of whether that right is being exercised in a given fiscal year. In

18

other words, property is "subject to assessment" if it is "assessable" under the CC&R's. We reach this conclusion for several reasons.

First, nothing in Exhibit D to the CC&R's establishes that undeveloped Property assessments were intended to be permanently extinguished upon a single instance of financial self-sufficiency (i.e., a cost center being fully funded without contribution from undeveloped Property Owners). Exhibit D does not even discuss financial self-sufficiency, except in the context of refunds, which apply only when "Common Assessments *levied against undeveloped Property* result in surplus funds being paid to or accumulated by the [HOA]." (Italics added.) There is certainly nothing in Exhibit D stating that undeveloped Property assessments shall end if a cost center is determined to be "fully funded" at some "predefined level," as the HOA asserted in its 2001-2005 budget packet disclosures.[8]

Nor are we persuaded that the reference to "early phases of development" in paragraph 2 of Exhibit D to the CC&R's has any bearing on this question. The language merely states that "the Declarant is willing to accept levels of Common Assessments on undeveloped portions of the Property which, *at least* during the early phases of development of the Property, may be disproportionately high…." (Italics added.) It does not state that Common Assessments will be limited to the early phases of development. To the contrary, it clearly contemplates that Common Assessments on undeveloped Property will extend beyond "the early phases of development."

Second, the definitions in the CC&R's establish that each Owner of a Lot or Parcel within the Property is liable for Common Assessments, distinguishing only between the portion of the Overall Property that is subject to the CC&R's and the portion

---

[8]     We also do not ignore that an earlier 1998 budget disclosure told Owners that Exhibit D to the CC&R's subsidy would continue "until all properties within a cost center are developed."

19

that is not.  For example, the CC&R's define the term "Common Assessment" to mean "the annual…charge against *each* Owner and his Lot or Parcel."  (Italics added.)  As discussed, the term Owner includes the "Declarant and Merchant Builders" and any other person "holding a fee simple or long-term ground leasehold interest of [r]ecord to a Lot or Parcel *within the Property*."  (Italics added.)  The CC&R's, in turn, define the term Property to mean "that portion of the Overall Property which at any particular time is subject to [the CC&R's]."

Other provisions of the CC&R's reinforce this view.  Section 6.05 of the CC&R's, which governs the collection of Common Assessments, provides:  "Sums sufficient to pay [c]ommon [e]xpenses shall be assessed as Common Assessments against the Owners of Lots or Parcels."  It then goes on to explain that such assessments "shall be allocated" among the Owners of developed and undeveloped Property as specified in section 6.05 and Exhibit D to the CC&R's.

To the same effect, paragraph 1 of Exhibit D to the CC&R's expressly states that "[a]ll [portions] of the Property shall pay assessments to satisfy the General Assessment Component" of the Common Assessments, and that the "portions of the Property lying within a particular Cost Center shall pay assessments to satisfy that Cost Center Component."  Further, paragraphs 2, 5, and 6 of Exhibit D suggest that assessments on undeveloped Property will continue until the entire Lot or Parcel is assessed as developed Property pursuant to section 6.05.  Collectively, these provisions support our conclusion that each Lot or Parcel *within the Property* was intended to be "subject to assessment."

Finally, and most importantly, article 14 of the CC&R's directly addresses the question of how Lots and Parcels become "subject to assessment" under the CC&R's.  The answer is that Lots and Parcels become subject to assessment upon annexation into the Property.  Section 14.01 provides that "[a]ny or all of the Overall Property may be annexed to and made subject to [the CC&R's]" by any of its authorized methods.  Section 14.11 describes the effect of annexation.  It provides that the filing of a Declaration of

Annexation "shall constitute and effectuate the annexation of the annexable property described therein, and thereupon the annexable property shall become and constitute a part of the Propert[y], and be subject to, and encompassed within, [the CC&R's]." It then states: "Lots and Parcels within the annexed property shall thereupon become *subject to Assessment* by the [HOA] ...and the Owners of Lots and Parcels within the annexed real property shall automatically become [m]embers of the [HOA]." (Italics added.) Section 14.05, which governs the Declaration of Annexation, is nearly identical. It states that upon the filing of a Declaration of Annexation, the annexed real property "shall become and constitute part of [the] Property," become subject to and encompassed within the CC&R's, and "become *subject to assessment*" by the HOA. (Italics added.)

In sum, it is clear from the structure of the CC&R's that whether a particular Lot or Parcel was "subject to assessment" depended on whether that Lot or Parcel was part of the Property to which the CC&R's apply. At the time of the recordation of the CC&R's, only the Phase 1 portion of the Property was "being developed." Thus, the Phase 1 property was the only portion of the Initial Property initially assessed as developed Property. The rest of the Initial Property was assessed as undeveloped Property, "as provided in Exhibit D," until "all or any portion of a Parcel" is subdivided into a residential subdivision (with at least one Lot or Residential Unit closing escrow) or improved with buildings, at which point it would "cease to be assessed as undeveloped and commence to be assessed [as developed Property]." The remaining Overall Property, not included in the Initial Property, was not subject to assessment because it was not yet part of the Property subject to the CC&R's, but it could be made subject to the CC&R's and become "subject to assessment" by annexation. Thus, by implementing the Development in phases, the developer could control when the undeveloped portions of the Overall Property would become subject to assessment, even if the developer had to be mindful of the time limitations on "unilateral" annexations.

21

We are not persuaded by the defendants' argument that Getz's interpretation cannot be squared with sections 4.01, 4.02, and 6.01 of the CC&R's, which recognize that Property might be owned by the Declarant or Merchant Builders and yet not be subject to assessment. There is no inconsistency. As discussed, the CC&R's expressly allow the developer to own Property that is not subject to assessment. This would occur any time the developer recorded a subdivision map for a parcel before annexing it and making it part of the Property.

We likewise reject the suggestion that Getz's interpretation is contrary to the stated purpose and intent of Exhibit D because it would expose the developer to disproportionately high assessments in the late stages of development. To begin, the argument is premised on a hypothetical state of events that seems divorced from reality, namely, that in the late stages of development the HOA would "ramp up spending" so far beyond the CPI Rate that the last remaining undeveloped Parcels would be forced to bear disproportionately high assessments. Nothing in the present record suggests this scenario is likely. But even if the possibility exists, it is a risk that the developer has assumed under the terms of the CC&R's. We find no evidence that Exhibit D to the CC&R's was intended to preclude disproportionately high assessments in the late stages of development.

Thus, for all these reasons, we conclude the trial court erred in granting defendants' motions for summary adjudication of the declaratory relief cause of action.

III

*Motions for Summary Judgment*

After granting summary adjudication of the first cause of action, the trial court granted the defendants' motions for summary judgment on the ground that the remaining claims were time-barred. The trial court ruled that because Getz was challenging the HOA's determination that Exhibit D to the CC&R's cap and subsidy arrangement had been extinguished, the trigger for the statute of limitations was the date in the early

22

2000's when the HOA disclosed that determination to the affected Property Owners. As a result, the court held that Getz's lawsuit was untimely, having been filed more than ten years after the HOA gave notice to the affected Owners.

On appeal, Getz challenges the grant of summary judgment. He argues that the trial court erred in determining that a single limitations period should apply, running from the date that the HOA gave notice of its determination. Relying on the continuous accrual doctrine, Getz argues that each wrongful assessment constitutes its own separate breach of the CC&R's. Thus, he contends his complaint is timely as to those breaches occurring within the applicable four-year limitations period (under § 337). Again, we agree with Getz.

" 'Critical to applying a statute of limitations is determining the point when the limitations period begins to run,' " i.e., when the cause of action accrues. (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1538.) Generally, " '[a] cause of action accrues "when [it] is complete with all of its elements'—those elements being wrongdoing, harm, and causation.' " (*Ibid*.) In other words, a cause of action accrues upon the occurrence of the last element essential to the cause of action. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815.)

However, there are several recognized exceptions to the general rule regarding accrual of a cause of action, among them, the continuous accrual doctrine. (*Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1341.) Under the continuous accrual doctrine, when an obligation or liability arises on a recurring basis, a cause of action accrues each time the wrongful act occurs, triggering a new limitations period. (*Ibid*.) Because each breach of the recurring obligation provides all the elements of a claim—wrongdoing, harm, and causation—each may be treated as independently actionable. (*Ibid*.) The effect of applying the doctrine is that " 'a suit for relief may be partially time-barred as to older events but timely as to those [acts of wrongdoing occurring] within the applicable limitations period.' " (*Ibid*.; see § 1047.) To determine

whether the continuous accrual doctrine applies, we look not to the claim's label but to the nature of the obligation allegedly breached. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1200.)

The obligation at issue here concerns the Common Assessments levied against Owners of Lots and Parcels within the Property. Such assessments are levied annually, based in part on the projected budget for the upcoming fiscal year, subject to the requirements of the CC&R's. The operative complaint alleges that defendants breached the CC&R's (and that the HOA violated its fiduciary duties) by charging Owners of developed Property annual assessments in excess of the CPI Rate and failing to adequately charge assessments to Owners of undeveloped Property. The complaint also alleges that the breaches are "continuing and ongoing," which served as the foundation for Getz's cause of action for declaratory relief. (See *Cordoba Corporation v. City of Industry, supra*, 87 Cal.App.5th at p. 157; *Moore v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 280, 295.)

We are persuaded that the continuous accrual doctrine applies to such allegations. The continuing nature of the obligation to levy "annual Common Assessments" in accordance with the CC&R's renders each breach of that obligation separately actionable. (*Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 378-382; *Gilkyson v. Disney Enterprises, Inc., supra*, 244 Cal.App.4th at p. 1346; *Aryeh v. Canon Business Solutions, Inc., supra*, 55 Cal.4th at pp. 1200-1201; *Howard Jarvis Taxpayers Assn. v. City of La Habra, supra*, 25 Cal.4th at pp. 819-825.)

The cases on which defendants rely are distinguishable because they involve one-time violations—denial of the right to reinstatement, to receive a pension, to reclassification, or to reimbursement—whereas this action alleges recurring violations of annual assessment obligations. (See *Dillon v. Board of Pension Comrs.* (1941) 18 Cal.2d 427 [right to pension]; *Carrick v. San Francisco* (1962) 202 Cal.App.2d 402 [right to reclassification for pension]; *County of San Diego v. Myers* (1983) 147 Cal.App.3d 417

24

[right to Medi-Cal reimbursement]; *Mezey v. State of California et al.,* (1984) 161 Cal.App.3d 1060 [right to reinstatement of employment]; see also *Howard Jarvis Taxpayers Assn. v. City of La Habra, supra,* 25 Cal.4th at pp. 822-823 [distinguishing *Dillon* and *Myers*]; *Baxter v. State Teachers' Retirement System, supra,* 18 Cal.App.5th at p. 381 [distinguishing *Dillon*, *Myers*, and *Carrick*].)

The result is that we agree that the trial court erred in refusing to apply the continuous accrual doctrine. While portions of Getz's action may be time-barred, his action is timely as to those breaches occurring within the four-year limitations period preceding the filing of his lawsuit.

Because we determine the trial court erred in granting summary judgment on the ground that the claims were time-barred, we need not address the parties' arguments concerning the discovery rule, equitable tolling, or equitable estoppel.

## DISPOSITION

The summary judgment is reversed, and the case is remanded with directions to (1) deny defendants' motions for summary adjudication of the first cause of action for declaratory relief; (2) rule on the merits of Getz's motion for summary adjudication on the issue of whether the HOA had a duty to demand that Serrano Associates pay its "fair share of the costs for maintaining improvements to public property," and (3) conduct further proceedings as are appropriate and not inconsistent with this opinion. Plaintiff Getz shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

\s\
Krause, J.

We concur:

\s\
Mauro, Acting P. J.

\s\
Feinberg, J.

26